## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BISHNU C. BORAH, M.D., P.C., and BISHNU BORAH, M.D., | Civil Action No. |
| Plaintiffs, | |
| v. | |
| MONUMENTAL LIFE INSURANCE COMPANY, COMMONWEALTH LIFE INSURANCE COMPANY, CAPITAL HOLDING COMPANY, INC., PROVIDIAN LIFE INSURANCE COMPANY, JACKSON NATIONAL LIFE INSURANCE COMPANY, AEGON USA, INC., BARRY COHEN, MICHAEL KIRWAN, KIRWAN FINANCIAL ADVISORY, INC., BCO FINANCIAL, THE MEDICAL SOCIETY OF NEW JERSEY, VINCENT MARESSA, PACIFIC EXECUTIVE SERVICES, DONALD S. MURPHY, DSM, INC., STEVEN R. ROSS, KENNETH ELLIOT, KAE CONSULTANTS, SILVIA CALHOUN ROSS, and SEA NINE ASSOCIATES, | |
| Defendants. | |

## COMPLAINT AND JURY DEMAND

Plaintiffs, Bishnu C. Borah, M.D. and Bishnu C. Borah, MD., P.C., by way of complaint against defendants, Monumental Life Insurance Company, Providian Life Insurance Company, Jackson National Life Insurance  Company, Barry Cohen, Michael Kirwan, Kirwan Financial Advisory, Inc., BCO Financial, The Medical Society of New Jersey, Vincent Maressa, Pacific Executive Services, Paul Weber, Joseph Lucci, Donald S. Murphy, DSM, Inc., Steven R. Ross, and Sea Nine Associates, hereby allege as follows:

## NATURE OF THE ACTION

1.     Plaintiffs were the targeted victims of a scheme by defendants to reap enormous profits by designing, marketing and selling a fraudulent and defectively life insurance product called Continuous Group or "C-Group" life insurance.  This insurance product was marketing by defendants through various Voluntary Employee Benefit Association ("VEBA") plans (hereinafter, the "VEBA plan).  The VEBA plan was presented as a way for physicians  to save for retirement by having their professional corporations make tax-deductible contributions to the VEBA plan.  In actuality, however, the VEBA plan could not, and did not, deliver as promised.  The defendants knew that the VEBA plan was flawed, that it was highly unlikely to work as marketed, and that plaintiffs were being put at risk by participating in, and contributing substantial sums to, the VEBA plan.  Plaintiffs have been damaged as a result of defendants' course of misconduct.

## JURISDICTION

2.     This Court has jurisdiction pursuant to 28 U.S.C. §1331 in that certain of the claims alleged herein arise under federal law, namely the Federal Racketeer Influence and Corrupt Organization Act, 18 U.S.C. §1961 to 1968.  This Court has supplemental jurisdiction over the state law claims.

## THE PARTIES

### A.     The Plaintiffs

3.     Plaintiff Bishnu Bora, M.D., P.C., is a professional corporation of the Commonwealth of Pennsylvania located at 380 Middletown Boulevard, Suite 703, Langhorne, Pennsylvania 19047.

4.     Plaintiff Bishnu Borah, M.D., is a citizen of the Commonwealth of Pennsylvania who resides at 1039 Drew Drive, Yardley, Pennsylvania 19067.

**B.**    **The Capital Defendants**

5.      Defendant Commonwealth Life Insurance Company ("Commonwealth Life") is an insurance company incorporated in the State of Kentucky with a place of business at 400 West Market Street, Louisville, Kentucky 40232. At all times relevant hereto, Commonwealth was licensed to do business in New Jersey and did do business in Pennsylvania.

6.      Commonwealth Life was held by, or merged with, Defendant Capital Holding Company, Inc. ("Capital"). In or about 1995, Capital changed its name to Providian Life. This entity, for purposes of this Complaint, shall hereinafter be referred to as "Capital/Providian Life." Capital/Providian Life was registered and licensed to do business in Pennsylvania and actually did sell, market, and otherwise distribute insurance policies, retirement products and other related products within the Commonwealth of Pennsylvania.

7.      Defendant Aegon USA, Inc. ("Aegon USA") is a corporation of the State of Delaware with a principal office at 4333 Edgewood Road, N.E.., Cedar Rapids, Iowa 52499. Upon information and belief, Aegon USA acquired Capital/Providian Life in November 1998.

8.      Defendant Monumental Life Insurance Company ("Monumental Life") is a Maryland insurance company with a principal place of business at 2 East Chase Street, Baltimore, MD 21202, as well as an office located at 1620 Route 22 East, Floor 3, Union, New Jersey 08708. At all times relevant herein, Monumental was licensed to do business in New Jersey and actually did business in New Jersey.

9.      Monumental Life is a successor, by merger, acquisition or change of name, to various insurance companies, including, but not limited to, Commonwealth Life.

10.      Capital/Providian Life and Aegon USA acquired, owned, guaranteed and/or are otherwise responsible for the obligations and actions and liabilities of Commonwealth Life and Monumental Life and are therefore responsible and liable for any and all injuries and damages to

Plaintiff arising from the obligations, actions and liabilities of Commonwealth Life and/or Monumental Life.

11.     For purposes of this Complaint, Commonwealth Life, Peoples Life, Capital Providian Life, Monumental Life, and Aegon USA may at times be referred to collectively as the "Capital Defendants."

12.     The Capital Defendants created, issued, marketed and sold the life insurance policies that are the subject of this litigation with full knowledge of and participation in the misrepresentations, material omissions and other deceptive conduct outlined below.


C.      **The PES Defendants**

13.     Defendant Stephen R. Ross ("Ross") was, upon information and belief, at all times relevant herein, a resident of the State of California and was engaged in the business of selling insurance and insurance-related products.  Ross is now deceased.

14.     Defendant Donald S. Murphy ("Murphy") was, upon information and belief, at all times relevant herein a resident of the State of California and was engaged in the business of selling insurance and insurance-related products.

15.     Defendant Pacific Executive Services, Inc. ("PES") was, upon information and belief, a California partnership formed by Ross and Murphy for the purpose of designing, marketing, administering and selling insurance, insurance-related products, and other benefit-related products and services. PES formed the Southern California Medical Profession Association VEBA trust and, upon information and belief, formed the New Jersey Medical Profession Association VEBA trust.  Upon information and belief, PES dissolved sometime between 1992 and 1994.

16.     Defendant Sea Nine Associates ("Sea Nine") was, upon information and belief, a sole proprietorship operated by Ross, with its principal place of business located at 7971 Seawall Circle, Huntington Beach, California 92648. Sea Nine designed, marketed, and sold insurance and insurance-related products, as well as administrative services related to the business of insurance and other benefit-related plans.  Sea Nine has continued to operate since Ross' death.

17.     Defendant DSM, Inc. ("DSM") was, upon information and belief, a corporation of the State of California owned and operated by Murphy, with its principal place of business located at 7131 Owensmouth Street, Suite 32B, Canoga Park, California. DSM designed, marketed, and sold insurance and insurance-related products, as well as administrative services related to the business of insurance and other benefit-related plans.

18.     For purpose of this Complaint, PES, Murphy, Ross, Sea Nine Associates, and DSM, Inc., may at times be referred to collectively as the "PES Defendants."

19.     The PES Defendants helped to create market and sell the life insurance products that are the subject of this litigation with full knowledge of and participation in the misrepresentations, material omissions and other deceptive conduct outlined below.

D.     **The Beaven Defendants**

20.     Defendant Raymond G. Ankner ("Ankner") is a citizen of the State of Florida who resides at 2002 Ft. Smith South, Naples, Florida.

21.     Inter-American Insurance Company of Illinois ("Inter-American") was, at times relevant hereto, an insurance company of the State of Illinois.  Upon information and belief, the Illinois Director of Insurance placed Inter-American into liquidation on December 31, 1991.

22.     Ankner was the president of Inter-American from its formation in 1974 until December 31, 1991.

23.    Beaven/Inter-American Companies, Inc. ("Beaven/Inter-American") was a holding company incorporated in the State of Delaware and authorized to do business in New Jersey.  At all times relevant herein, Beaven/Inter-American, Inc. wholly owned Inter-American.

24.    At all times relevant herein, Ankner was the sole shareholder of Beaven/Inter-American.

25.    Following the liquidation of Inter-American, Beaven/Inter-American changed its name to Defendant Beaven Companies, Inc. ("Beaven Companies").  Beaven Companies is a successor corporation to Beaven/Inter-American.

26.    At all times relevant herein, Ankner was the sole shareholder and president of Beaven Companies.

27.    Defendant CJA Associates, Inc. ("CJA") is a corporation of the State of Delaware and is engaged in the marketing of insurance and insurance-related products.  Ankner is the principal of CJA.

28.    For purposes of this Complaint, Beaven Companies, Inter-American, Beaven/Inter-American, and CJA may be referred to collectively as the "Beaven Entities."

29.    Since the early 1990's, Ankner, through the Beaven Entities, has held himself out as a designer of insurance products.  Ankner, through the Beaven Entities, helped to create, design and market the defective insurance products that are the subject of this lawsuit with full knowledge of and participation in the misrepresentations, material omissions and other deceptive conduct outlined below.

E.    **The Kirwan Defendants**

30.    Defendant Kirwan Financial Group, Inc. ("Kirwan Financial") is a licensed insurance agent, registered investment advisor and representative of various insurance companies.  At all times relevant herein, Kirwan Financial had its principal place of business at

6

402 Middletown Blvd., Suite 202, Langhorne, Pennsylvania 19047, and actually did business in New Jersey and was authorized by applicable New Jersey statutes and regulations to sell and market insurance products, retirement plans and life insurance policies on behalf of various insurance companies and other entities in New Jersey.

31.     Defendant Kirwan Financial Advisory, Inc. ("Kirwan Advisory") is a licensed insurance agent, registered investment advisor and representative of various insurance companies. At all times relevant to this Complaint, Kirwan Advisory had its principal place of business at 402 Middletown Blvd., Langhorne, Pennsylvania 19047, and actually did business in New Jersey and was authorized by applicable New Jersey statutes and regulations to sell and market insurance products, retirement plans and life insurance policies on behalf of various insurance companies and other entities in New Jersey.

32.     For purposes of this Complaint, Kirwan Financial and Kirwan Advisory may at times be referred to collectively as the "Kirwan Companies."

33.     Defendant Barry Cohen ("Cohen") is a licensed insurance agent, registered investment advisor and representative of various insurance companies. At all times relevant herein, Cohen operated out of the offices of the Kirwan Companies in Langhorne, Pennsylvania and actually did business in New Jersey. Cohen was an officer, director, employee, and part-owner of the Kirwan Companies.

34.     Defendant Michael Kirwan ("Kirwan") is a licensed insurance agent, registered investment advisor and representative of various insurance companies. At all times relevant herein, Kirwan operated out of the offices of the Kirwan Companies in Langhorne, Pennsylvania and actually did business in New Jersey. Kirwan was the president, director, employee, and part-owner of the Kirwan Companies.

35.     Defendant BCo Planning ("BCo"), upon information and belief, was a financial planning company owned and operated by defendant Cohen at times relevant hereto.

36.     For purposes of this Complaint, Cohen, Kirwan, Kirwan Financial, BCo and Kirwan Advisory may at times be referred to collectively as the "Kirwan Defendants."

37.     At all times relevant hereto, the Kirwan Defendants acted as the authorized agents of the Capital Defendants and Indianapolis Life during the course of marketing the policies at issue in this litigation through the misrepresentations, material omissions and other deceptive conduct outlined below.

38.     The insurance product that Ankner and Inter-American originally designed and that the remaining Defendants thereafter marketed and sold is known as the continuous group ("C-Group") product.  As the United States Tax Court subsequently described it, the C-Group product "masquerade[s] as a policy that provides only term life insurance benefits in order to make the product marketable to targeted investors and to allow . . . [an insurance company] to make life insurance purchases from it more attractive than purchases from its larger competitors."

39.     The PES Defendants and the Beaven Defendants engaged the services of various insurance salesmen and financial planners to join their scheme and market the defective insurance products to medical professionals.  The Kirwan Defendants were among those who agreed to join the scheme and market the policies.

40.     The Kirwan Defendants agreed, in return for a percentage of annual premiums and/or other compensation, to sell the insurance policies to their clients, including Plaintiff, through the VEBA scheme.

41.     The Kirwan Defendants, the PES Defendants and the Beaven Defendants entered

into a series of agreements with each other and with the Capital Defendants and Indianapolis

Life by which they agreed to act as the agents of the Capital Defendants and Indianapolis Life in

marketing the insurance products.

42.     All of these Defendants agreed to and did participate in the VEBA scheme with

full knowledge that it was unlawful and that Plaintiff and the other members of the class would

suffer significant financial harm.

**F.      The Medical Society Of New Jersey**

43.     Defendant The Medical Society of New Jersey ("MSNJ"), is a professional

society organized under the laws of the State of New Jersey with a principal office located at 2

Princess Road, Lawrenceville, New Jersey 08848, and was properly registered and licensed to do

business and actually did do business in New Jersey.

44.     Defendant Vincent Maressa ("Maressa"), was, at all times, the Executive Director

of the MSNJ, and upon information and belief, is a resident of the State of New Jersey who

resides at 231 Pleasant Valley Road, Titusville, New Jersey

45.     For purposes of this Complaint, the MSNJ, and Maressa, may at times be referred

to collectively as the "MS Defendants."

## FACTUAL BACKGROUND

**A.      The VEBA Scheme**
**        The Creation of the VEBA Scheme**

46.     Enacted in 1984, Section 419A(f)(6) of the Internal Revenue Code allows for the

favorable tax treatment of contributions to certain "10-or-more employer" welfare benefit plans.

The Tax Reform Act of 1986 thereafter restricted the ability of small businesses to reduce their

tax liabilities through contributions to other types of employee benefit plans.

47.    In response to these changes in the tax laws, and realizing that small businesses would not otherwise be interested in purchasing cash value life insurance, in or about 1990, the PES entities and Raymond Ankner devised the idea of using C-Group insurance policies, which Ankner had designed and was marketing through Inter-American Insurance Company, in the context of purported employee benefit plans.  These defendants determined that they could market C-Group policies -- which are very expensive and generate high commissions -- to physicians and other small businesses through purported employee benefit plans.

48.    In order to market the C-Group policies to physicians, these defendants determined to use VEBAs, which are multiple employer welfare benefit plans that have received a ruling from the Internal Revenue Service that they are tax exempt organizations under IRC § 501(c)(9). Defendants used the VEBA structure to deceive employers into believing that the IRS has ruled that contributions to VEBAs are tax deductible, when, in fact, the IRS expressly took no position on that issue.

**B.    The Insurance Product**

49.    The C-Group insurance product devised by Ankner and sold and marketing by him and his companies and the other defendants, has been described by the United States Tax Court as an insurance product that "masquerade[s] as a policy that provides only term life insurance benefits in order to make the product marketable to targeted investors and to allow. . . [an insurance company] to make life insurance purchases from it more attractive than purchases from its larger competitors."   Neonatology Associates, PA v. Commissioner of Internal Revenue, 115 T.C. No. 5 (Tax Ct. 2000), aff'd, 299 F.3d 221 (3d Cr. 2002).

50.    The C-Group product is actually a universal life insurance product consisting of two related policies. The first policy, which is used during the "accumulation" phase of the VEBA plan, is a group term life insurance policy known as the "C-Group term policy." The

second policy, the "payout" phase of the VEBA plan, is an individual universal life insurance policy known as the "C-Group conversion Universal Life" ("UL") policy.

51.     The C-Group product had a special conversion feature. The C-Group term policy provided covered employees with a life insurance or death benefit while they worked. It also provided that, upon termination, a participant could "convert" the C-Group term policy to the UL policy and, over time, could access the cash value.

52.     The UL policy is not in existence at the time the group life policy is sold, and its terms are not disclosed until an employee exercised a conversion privilege.  The UL policy was not approved for use in several states, including New Jersey.

53.     The premiums for the C-Group product were significantly higher than the premiums for conventional group term life insurance policies. Plaintiff and the other members of the class were advised, as set forth in greater detail below, that these substantially higher premiums were necessary because the premiums were intended to fund (1) the pre-conversion death benefits; (2) post-conversion credits that would pay for the premiums to continue the UL policy; and (3) the "tax-free" retirement income that would be generated by the UL policy.

54.     The C-Group term policy was designed to masquerade as a single group policy but the scheme required that the policy be owned by a VEBA that was formed and operated by the PES Defendants. The participating employers would then become "members" of the VEBA.

55.     The C-Group term policy was disguised to resemble term life insurance in an attempt to justify a tax-deduction for the very large contributions made to the VEBA plan. Plaintiffs and the members of the class were advised that most of these contributions were being held in trust to fund the promised retirement benefits available in the post-conversion stage.

56.     After the C-Group term policy had accumulated sufficient policy reserves (but showing no cash values), participants were instructed to perform the so-called conversion and, thus, move to the UL stage of the C-Group product.

57.     The practical effect of the conversion was that the group term life insurance policy became an individual policy, and thus the personal property of the individual participant.

58.     On the conversion transaction date, the life insurance policy technically had no "cash value" as that term is normally defined and plaintiffs and the other members of the class were advised that the conversion was purportedly tax free.  Defendants knew, or should have known, that the provisions in the federal Income Tax Regulations upon which they ruled in making these representations did not apply.

59.     After the conversion transaction date, defendants represented that the UL policy's cash values would soar after a short period of time with the payment of very small or no premiums.

60.     Defendants represented to plaintiffs that the cash values that were earned from the very large premiums paid during the C-group term policy stage, while the term policy was owned by the VEBA, would fund the retirement benefits that were promised in the post-conversation UL policy stage.

61.     Defendants marketed their scheme by representing that these second stage "conversion policies" would have sufficient value so that participants could borrow against the value of their policies in order to generate retirement income. The loans against their insurance policies would be in the form of "tax free" loans provided by the converted policies.

62.     To effectuate their scheme, the defendants engaged the services of various insurance companies and insurance agents.  Among the insurance companies that issued "C-

12

Group" policies (later known as "Group Plus" policies) were the Inter-American Life Insurance Company, Commonwealth Life Insurance Company, Indianapolis Life Insurance Company, and the Baltimore Life Insurance Company. Inter-American's Insolvency and the Alleged "Strategic Partnership" with the Capital Defendants

63.     The PES Defendants, the Beaven Defendants and the Kirwan Defendants initially pursued the VEBA scheme by selling insurance policies that were issued by Inter-American.

64.     In December 1991, Inter-American was seized by the Illinois Insurance Department due to solvency concerns and was placed into liquidation.

65.     The Beaven Defendants and the PES Defendants then recruited the Capital Defendants to create a virtually identical C-Group product that was then substituted for the Inter-American C-Group product.  The PES Defendants, the Beaven Defendants, the Kirwan Defendants and others thereafter jointly marketed the insurance products as agents of the Capital Defendants.

**C.     The Creation of the "Medical Associations" and the VEBAs**

66.     The PES Defendants realized that, in order to carry out their scheme, they needed to create one or more VEBAs for prospective participants to "join."

67.     Therefore, the PES Defendants established several "associations" named after the medical profession through which to create, operate, and market their scheme. The associations they established included the Southern California Medical Profession Association ("SCMPA") and the New Jersey Medical Profession Association ("NJMPA").

68.     The NJMPA and the SCMPA were established, managed, and controlled by the PES Defendants to market and further their scheme by misleading targeted investor/medical professionals into believing that respectable, established medical associations were sponsoring their scheme.

13

69.     The PES Defendants, acting with and through the SCMPA, formed the Southern California Medical Profession Association VEBA ("SC VEBA").

70.     The PES Defendants, acting with and through the NJMPA, formed the New Jersey Medical Profession Association VEBA ("NJ VEBA").

71.     The PES Defendants named the SC VEBA and the NJ VEBA after the medical profession in an attempt to deceive potential participants and to legitimize their sale of the advertised tax benefits to their targeted investors.

72.     The SC VEBA and the NJ VEBA were represented by defendants to be employee benefit plans that qualified for favorable tax treatment under IRC § 419A(f)(6).

73.     In order to participate in the VEBA plan, participating employers were required to "join" the NJMPA or the SCMPA, as well as to join the SC VEBA or the NJ VEBA.

74.     The SC VEBA and the NJ VEBAs were structured so that each participating employer also established its own employer-sponsored benefit plan for its covered employees. These individual employer benefit plans were created using the names of the respective employers.

75.     The employer plans were encouraged and instructed to "select" the PES Defendants to serve as administrators of the individual employer plans, and to have Murphy and/or Ross serve on the plan "committee." The employer plans were also encouraged to "select" insurance agents within the PES agent network to also serve on the plan committees. In this way, the PES Defendants controlled the plan contributions and the purchaser of the insurance products to fund the purported benefits.

76.     The PES Defendants, as well as agents within the PES agent network, charged the employer benefit plans annual administrative fees for these services.

77.     The PES Defendants engaged the services of various insurance salesmen and financial planners to join their scheme and market the defective insurance products to medical professionals, including Kirwan Financial Advisory, Inc., which was owned and operated by insurance salesman Michael Kirwan and Barry Cohen (the "Kirwan Entities").

78.     The Kirwan Entities agreed, in return for a percentage of annual premiums and/or other compensation, to sell participation in the VEBA plan to their clients, and others, including plaintiffs.

79.     Upon information and belief, The Kirwan Entities and the PES Defendants entered into one or more agreements with each other and/or with the insurance carriers to act as the agents of the PES Defendants and the insurance carriers in marketing participation in the VEBA plan.

**D.     The MSNJ Endorses the VEBAs**

80.     In an attempt to legitimize the their scheme to market the insurance products to the class members, the PES Defendants, with the knowledge, consent and active support of the Kirwan Entities, paid the MSNJ to endorse the VEBAs.

81.     The MSNJ is widely recognized and respected by physicians in New Jersey as a source of accurate and reliable information concerning topics of concern to physicians.

82.     The MSNJ entered into an arrangement with the Kirwan Entities whereby the MSNJ was to receive royalties in connection with contributions by medical professionals to the VEBA program.

83.     Maressa, in his capacity as general counsel of the MSNJ, was responsible to confirm that the program complied with applicable provisions of the tax code and would not put members of the MS at a risk.  In order to fulfill this responsibility, Maressa requested that the Kirwan defendants provide him with an opinion letter that supported the anticipated tax

15

treatment for physicians who participated in the VEBA program.  Although Maressa received an opinion letter from the Kirwan defendants, that opinion letter described a program that was materially different from the VEBA program.  The opinion letter provided to Maressa did not support the tax treatment claim for the VEBA and Maressa knew it.

84.     Based upon this letter, Maressa knew that the VEBA program would not operate as represented, and that physicians who participated in the program would be in danger of adverse tax consequences.   Despite this knowledge, Maressa authorized and directed the MSNJ to represent to its members - - and to physicians in states other than New Jersey - - that it had submitted the VEBA program to prestigious accounting firm of Ernst & Young for examination, and that Ernst & Young had given a favorable tax opinion concerning the VEBA program.  In fact, Maressa and that MSNJ never submitted the VEBA program to Ernst & Young for examination and Ernst and Young had never reviewed, approved or endorsed the program. Moreover, Ernst & Young also never authorized the MSNJ or the Kirwan defendants to use its name or to claim it had endorsed the program.

85.     Despite these facts, in repeated communications to plaintiff and others, the MSNJ and the Kirwan defendants, as part of their efforts to market the VEBA program to physicians, repeatedly represented that Ernst & Young had reviewed and approved the program.  Maressa has admitted that Ernst & Young never reviewed or approved the VEBA program and it was a misrepresentation for the MSNJ and Kirwan Financial to claim otherwise.

86.     During the period from 1990 to 1995, the MSNJ played a crucial role in assisting the Kirwan Financial defendants to market the VEBA program to physicians.  The MSNJ assisted the Kirwan defendants in marketing that program not only to physicians in New Jersey, but also to physicians in numerous other states, including Pennsylvania.

87.    During the same period, the professional staff of the MSNJ, including Maressa and others, received numerous letters and other written materials that challenged the legality of the VEBA program.  Despite the warnings contained in these letters, and with full knowledge that its representations and the representations of the Kirwan defendants were likely to mislead and harm its members, the MSNJ continued with its endorsement of the VEBA program.

88.    The MSNJ accepted these representations blindly and recklessly, and without subjecting the actual VEBA plan for independent review to determine whether they were accurate or truthful.

E.    **The Misrepresentations, Omissions and Other Deceptive Conduct Of Defendants in Marketing of the VEBA Scheme**

89.    The Defendants knew that most small businesses, including the physicians to whom they intended to market and did market the VEBA plan, did not need and did not desire to purchase cash value life insurance or additional death benefit protections.

90.    Beginning in 1990, defendants induced physicians, physician practices and others (including plaintiffs) to participate in and to contribute substantial sums to the VEBA plan by making false statements, by failing to disclose material information, and through other deceptive conduct. The defendants' activities included but were not limited to the following:

a.    misrepresenting that participants in the VEBA plan would receive favorable tax treatment, including 100% tax deductions for their contributions and significant amounts of "tax-free" retirement income;

b.    failing to disclose the risk that the IRS would challenge and disallow the tax treatment claimed by defendants;

c.    misrepresenting that the VEBA plan had been endorsed by various legitimate medical associations;

17

      d.     failing to disclose that the medical associations had been paid for their endorsements;

      e.     misrepresenting that the VEBA plan had been endorsed, approved by, or used by various governmental entities, financial institutions, accountings firms and law firms;

      f.     failing to disclose that the endorsements and approvals of various entities did not relate to the tax treatment that defendants were claiming;

      g.     failing to disclose that many of those purported approvals and endorsements were for different plans or based upon false or incomplete information mounted by defendants;

      h.     misrepresenting that contribution amounts were "entirely flexible;"

      i.     failing to disclose that missed contributions would cause the benefits to terminate and/or have very little or no value to class members;

      j.     using false and/or misleading illustrations;

      k.     misrepresenting that participants would receive "paid-up" life insurance and substantial tax-free retirement income following conversion;

      l.     misrepresenting that participants would receive so-called "conversion credits;"

      m.     misrepresenting that contributions would be held in trust by reputable financial institutions and that the insurance products would be underwritten by financially solvent insurers;

      n.     failing to disclose the commissions or royalties that would be received by the various defendants;

o.      failing to disclose that the insurance carriers intentionally deceived various state insurance regulators about the true nature of the VEBA plan and the insurance proceeds that funded it; and

p.      failing to disclose that representations and statements made to the IRS and state authorities regarding various aspects of the VEBA plan were false and contradicted statements and representations made to class members on the same topics.

91.    Marketing information used to induce plaintiffs to participate in the VEBA plan were created, provided and/or approved by the defendants.

92.    The defendants authorized and/or trained salespersons and other individuals, including the Kirwan Entities, to market the VEBA plans on their behalf, using a series of misleading and deceptive representations and omissions.

93.    Defendants also marketed the VEBA plan through the use of omissions.

94.    At all times relevant hereto, defendants, knowingly and intentionally participated in the above-described scheme to defraud plaintiffs with full knowledge of the misrepresentations, material omissions and deceptive conduct outlined in this Complaint, knowing that such misrepresentations, materials omissions and deceptive conduct were false and misleading. Defendants at all times knew that plaintiffs would rely upon, and did rely upon, defendants' misrepresentations, materials omissions, and deceptive conduct outlined above, to the detriment of plaintiffs.

95.    Indeed, based upon the false and misleading representations made by defendants, numerous physicians in New Jersey and elsewhere, including in Pennsylvania, were induced to participate in and contribute to the VEBA plans and, through those plans, to purchase C-Group policies.

19

96.     During the period beginning in 1990, Plaintiffs contribute din excess of $100,000 to the VEBA program based upon the false and misleading representations made by the various defendants as part of the VEBA scheme outlined in this complaint.

97.     Plaintiffs only recently learned, based upon other litigation against defendants brought by other victims of the VEBA scheme, that hey were fraudulent induced to participate in the VEBA Plan and have lost most, if not all of their contributions to the VEBA program.

### COUNT I
### (Violation of the Federal Racketeer Influenced
### and Corrupt Organizations Act ("RICO")
### Plaintiffs v. the PES Defendants, the Kirwan Defendants
### the Beaven Defendants, the Capital Defendants
### [The SC VEBA as Enterprise]

98.     Plaintiffs incorporate the allegations of Paragraphs 1 through and including 98 as if fully set forth herein.

99.     Plaintiffs are "persons" within the meaning of 18 U.S.C. § 1961(3).

100.    The PES Defendants, the Kirwan Defendants, the Beaven Defendants, the Capital Defendants, and the MS Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

101.    The SC VEBA is an "enterprise" engaged in, and the activities of which affect, interstate or foreign commerce, within the meaning of 18 U.S.C. § 1961(4).

102.    The PES Defendants, the Kirwan Defendants, the Beaven Defendants, the Capital Defendants, and the MS Defendants participated, directly or indirectly, in the conduct of the affairs of the SC VEBA through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5), and thereby violated 18 U.S.C. § 1962(c).

103.    The pattern of racketeering activity engaged in by the PES Defendants, the Kirwan Defendants, the Beaven Defendants, the Capital Defendants, and the MS Defendants

20

consisted of numerous violations of 18 U.S.C. §§ 664, 1341 and 1343, in that said Defendants embezzled, stole, or unlawfully and willfully converted to their use assets of employee welfare benefit plans, in violation of 18 U.S.C. § 664, and formulated a scheme or artifice to defraud Plaintiffs and the other members of the class and used the U.S. mails and the interstate wires in furtherance of that scheme, in violation of 18 U.S.C. §§ 1341 and 1343.

104.    The mail and wire communications used in furtherance of the scheme engaged in by the Defendants' named in this count included, but were not limited to:

a.    mailings from Defendants to Plaintiffs;

b.    mailings from Defendants to other participants in the VEBA Plan;

c.    mailings between Defendants and tax advisors and accountants for participants in the VEBA Plan;

d.    mailings from Defendants to the various professionals, such as accountants and law firms, or other representatives of Plaintiffs and the class;

e.    mailings and interstate telephone communications among Defendants;

f.    interstate telephone communications between Defendants and Plaintiffs and the class;

g.    interstate telephone communications between Defendants and various professionals, such as accountants and law firms, or other representatives of Plaintiffs and the class; and

h.    interstate telephone communications between Defendants and other participants in the VEBA Plan.

105.    The pattern of racketeering activity engaged in by these Defendants began in or about 1990 and has continued to date and is part of Defendants' way of doing business.

106.    Plaintiffs and the other members of the class have suffered injury to their business or property within the meaning of 18 U.S.C. § 1964(c) as a consequence of the violation by the PES Defendants, the Beaven Defendants, the Capital Defendants, the Kirwan Defendants, and the MS Defendants of 18 U.S.C. § 1962(c).

107.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs and the other members of the class are entitled to recover treble damages, attorneys' fees and related expenses and appropriate equitable relief.

## COUNT II
### (Violation of the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO") Plaintiffs v. the PES Defendants, the Kirwan Defendants, the Beaven Defendants, the Capital Defendants, [The NJ VEBA as Enterprise]

108.    Plaintiffs incorporate the allegations of Paragraphs 1 through and including 308 as if fully set forth herein.

109.    Plaintiffs and the other members of the class are "persons" within the meaning of 18 U.S.C. § 1961(3).

110.    The PES Defendants, the Kirwan Defendants, the Beaven Defendants, the Capital Defendants, and the MS Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

111.    The NJ VEBA is an "enterprise" engaged in, and the activities of which affect, interstate or foreign commerce, within the meaning of 18 U.S.C. § 1961(4).

112.    The PES Defendants, the Kirwan Defendants, the Beaven Defendants, the Capital Defendants, and the MS Defendants participated, directly or indirectly, in the conduct of the affairs of the NJ VEBA through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5), and thereby violated 18 U.S.C. § 1962(c).

113.     The pattern of racketeering activity engaged in by the Defendants named in this count consisted of numerous violations of 18 U.S.C. §§ 664, 1341 and 1343, in that said Defendants embezzled, stole, or unlawfully and willfully converted to their use assets of employee welfare benefit plans, in violation of 18 U.S.C. § 664, and formulated a scheme or artifice to defraud Plaintiffs and the other members of the class and used the U.S. mails and the interstate wires in furtherance of that scheme, in violation of 18 U.S.C. §§ 1341 and 1343.

114.     The mail and wire communications used in furtherance of the scheme engaged in by the Defendants named in this count included, but were not limited to:

   a.     mailings from Defendants to Plaintiffs;

   b.     mailings from Defendants to other participants in the VEBA Plan;

   c.     mailings between Defendants and tax advisors and accountants for participants in the VEBA Plan;

   d.     mailings from Defendants to the various professionals, such as accountants and law firms, or other representatives of Plaintiffs and the class;

   e.     mailings and interstate telephone communications among Defendants;

   f.     interstate telephone communications between Defendants and Plaintiffs and the class;

   g.     interstate telephone communications between Defendants and various professionals, such as accountants and law firms, or other representatives of Plaintiffs and the class; and

   h.     interstate telephone communications between Defendants and other participants in the VEBA Plan.

115.    The pattern of racketeering activity engaged in by these Defendants began in or about 1990 and has continued to date and is part of Defendants' way of doing business.

116.    Plaintiffs and the other members of the class have suffered injury to their business or property within the meaning of 18 U.S.C. § 1964(c) as a consequence of the violation by the PES Defendants, the Beaven Defendants, the Capital Defendants, the Kirwan Defendants, and Indianapolis Life of 18 U.S.C. § 1962(c).

117.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs and the other members of the class are entitled to recover treble damages, attorneys' fees and related expenses and appropriate equitable relief.

## COUNT III
### (Violation of Federal RICO)
### Plaintiffs v. the PES Defendants, the Kirwan Defendants, the Beaven Defendants, the Capital Defendants, [SCMPA and NJMPA as Enterprises]

118.    Plaintiffs incorporate the allegations of Paragraphs 1 through and including 318 as if fully set forth herein.

119.    Plaintiffs are "persons" within the meaning of 18 U.S.C. § 1961(3).

120.    The PES Defendants, the Kirwan Defendants, the Beaven Defendants, the Capital Defendants, and the MS Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

121.    Each of the SCMPA and the NMMPA is an "enterprise" engaged in, and the activities of which affect, interstate or foreign commerce, within the meaning of 18 U.S.C. § 1961(4).

122.    The PES Defendants, the Kirwan Defendants, the Beaven Defendants, the Capital Defendants, and the MS Defendants participated, directly or indirectly, in the conduct of the affairs of the SCMPA and the NJMPA through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5), and thereby violated 18 U.S.C. § 1962(c).

123.    The pattern of racketeering activity engaged in by the Defendants named in this count consisted of numerous violations of 18 U.S.C. §§ 664, 1341 and 1343, in that said Defendants embezzled, stole, or unlawfully and willfully converted to their use assets of employee welfare benefit plans, in violation of 18 U.S.C. § 664, and formulated a scheme or artifice to defraud plaintiffs and others and used the U.S. mails and the interstate wires in furtherance of that scheme, in violation of 18 U.S.C. §§ 1341 and 1343.

124.    The pattern of racketeering activity engaged in by these Defendants began in or about 1990 and has continued to date and is part of Defendants' way of doing business.

125.    Plaintiffs and the other members of the class have suffered injury to their business or property within the meaning of 18 U.S.C. § 1964(c) as a consequence of the violation by the PES Defendants, the Beaven Defendants, the Capital Defendants, the Kirwan Defendants, and Indianapolis Life of 18 U.S.C. § 1962(c).

126.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs and the other members of the class are entitled to recover treble damages, attorneys' fees and related expenses and appropriate equitable relief.

## COUNT IV
### (Violation of Federal RICO)
### All Plaintiffs v. All Defendants

### [Association-in-Fact Enterprise]

127.    Plaintiffs incorporate the allegations of Paragraphs 1 through and including 327 as if fully set forth herein.

128.    Plaintiffs  are "persons" within the meaning of 18 U.S.C. § 1961(3).

129.    The PES Defendants, the Kirwan Defendants, the Beaven Defendants, the Capital Defendants, and the MS Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

130.   The association in fact of the Defendants named in this court is an "enterprise" engaged in, and the activities of which affect, interstate or foreign commerce, within the meaning of 18 U.S.C. § 1961(4).

131.   The PES Defendants, the Kirwan Defendants, the Beaven Defendants, the Capital Defendants and the MS Defendants participated, directly or indirectly, in the conduct of the affairs of an association in fact through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5), and thereby violated 18 U.S.C. § 1962(c).

132.   The pattern of racketeering activity engaged in by the Defendants named in this count consisted of numerous violations of 18 U.S.C. §§ 664, 1341 and 1343, in that said Defendants embezzled, stole, or unlawfully and willfully converted to their use assets of employee welfare benefit plans, in violation of 18 U.S.C. § 664, and formulated a scheme or artifice to defraud Plaintiffs and the other members of the class and used the U.S. mails and the interstate wires in furtherance of that scheme, in violation of 18 U.S.C. §§ 1341 and 1343.

133.   The pattern of racketeering activity engaged in by these Defendants began in or about 1990 and has continued to date and is part of Defendants' way of doing business.

134.   Plaintiffs and the other members of the class have suffered injury to their business or property within the meaning of 18 U.S.C. § 1964(c) as a consequence of the violation by the PES Defendants, the Beaven Defendants, the Capital Defendants, the Kirwan Defendants, and Indianapolis Life of 18 U.S.C. § 1962(c).

135.   Pursuant to 18 U.S.C. § 1964(c), Plaintiffs and the other members of the class are entitled to recover treble damages, attorneys' fees and related expenses and appropriate equitable relief.

## COUNT V
### (Conspiracy to Violate Federal RICO)
### Plaintiffs v. All Defendants

136.    Plaintiffs incorporate the allegations of Paragraphs 1 through and including 336 as if fully set forth herein.

137.    The PES Defendants, the Kirwan Defendants, the Capital Defendants, Beaven Defendants, and the MS Defendants agreed to and assisted each other  in the marketing of the VEBA Plan and the insurance policies provided as part of the scheme.  These Defendants knew that the scheme was being marketed in a false and deceptive manner, and that the benefits of insurance policies were being misrepresented, and nevertheless took affirmative steps to assist the other Defendants by, among other things, providing misleading policy projections and illustrations.

138.    Through the wrongful conduct alleged above, said defendants conspired to violate 18 U.S.C. § 1962(c) as set forth above and have thereby violated 18 U.S.C. § 1962(d).

139.    The MSNJ agreed to and did assist the other Defendants and others in the marketing of the VEBA Plan.  NJMS knew that the scheme was being marketed in a false and deceptive manner, and nevertheless took affirmative steps by assisting these Defendants in marketing the VEBA Plan to NJMS members.  Said affirmative steps included the dissemination of false information concerning the VEBAs, such as false written statements to the effect that the well-known accounting firm of Ernst & Young had reviewed and approved the VEBA programs.

140.    Through the wrongful conduct alleged above, these Defendants conspired with the other Defendants to violate 18 U.S.C. § 1962(c) as set forth in those counts and have thereby violated 18 U.S.C. § 1962(d).

141.    Plaintiffs and the other members of the class have suffered injury to their businesses or property within the meaning of 18 U.S.C. § 1964(c) as a consequence of the violation by all Defendants of 18 U.S.C. § 1962(d).

142.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs and the other members of the class are entitled to recover treble damages, attorneys' fees and related expenses and appropriate equitable relief.

### COUNT VI
### (Violation of the New Jersey Racketeering Act)
### Plaintiffs v. the PES Defendants, Kirwan Defendants, the Beaven Defendants, the Capital Defendants

143.    Plaintiffs incorporate the allegations of Paragraphs 1 through and including 344 as if fully set forth herein.

144.    Plaintiffs and the other members of the class are "persons" within the meaning of N.J.S.A. §2C:41-1.

145.    The PES Defendants, the Kirwan Defendants the Beaven Defendants, the Capital Defendants, and the MS Defendants and are "persons" within the meaning of N.J.S.A. §2C:41-1(b).

146.    In the alternative, each of the SC VEBA, the NJ VEBA, the SCMPA, the NJMPA, and the association-in-fact of the PES Defendants, the Kirwan Defendants, the Beaven Defendants, the Capital Defendants, and the MS Defendants, was an "enterprise" engaged in, and the activities of which affected, interstate or foreign commerce, within the meaning of N.J.S.A. §2C:41-1(c).

147.    The PES Defendants, the Kirwan Defendants, the Beaven Defendants, the Capital Defendants, and the MS Defendants participated, directly or indirectly, in the conduct of the

affairs of each of these enterprises through a pattern of racketeering activity, in violation of N.J.S.A. §2C:41-2(c).

148.    The pattern of racketeering activity engaged in by the Defendants named in this count consisted of numerous violations of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, and of Titles 54 and 54A of the New Jersey Statutes.

149.    The pattern of racketeering activity engaged in by the Defendants named in this count consisted of numerous violations of 18 U.S.C. §§ 1341 and 1343, in that said Defendants formulated a scheme or artifice to defraud Plaintiffs and the other members of the class and used the U.S. mails and the interstate wires in furtherance of that scheme, in violation of 18 U.S.C. §§ 1341 and 1343.

150.    The pattern of racketeering activity engaged in by the Defendants named in this count began in or about 1990 and has continued to date and is part of these Defendants' way of doing business.

151.    Plaintiffs and the other members of the class have suffered injury to their businesses or property within the meaning of N.J.S.A. §2C:41-4(c) as a consequence of the foregoing violations of N.J..S.A. §2C:41-21(c).

## COUNT VII
### (Conspiracy to Violate the New Jersey Racketeering Act)
### Plaintiffs v. All Defendants

152.    Plaintiffs incorporate the allegations of Paragraphs 1 through and including 353 as if fully set forth herein.

153.    Through the wrongful conduct alleged above, all Defendants conspired to violate N.J.S.A. §2C:41-2(c) and thereby violated N.J.S.A. § 2C:41-2(d).

154.    Defendants conspired to design, market and sell the insurance products through the use of fraud and other unlawful and deceptive conduct, as outlined in this Complaint.

155.    Plaintiffs and the other members of the class have suffered injury to their businesses or property within the meaning of N.J.S.A. § 2C:41-4(c) as a consequence of the violation by all Defendants of N.J.S.A. § 2C:41-2(d).

## COUNT XIII
### (Violation of the New Jersey Consumer Fraud Act)
### Plaintiff v. The PES Defendants, Kirwan Defendants,
### Capital Defendants, Indianapolis Life, and Beaven Defendants

156.    Plaintiffs incorporate the allegations of Paragraphs 1 through and including 156 as if fully set forth herein.

157.    Plaintiffs and defendants are all "persons" within the meaning of N.J.S.A. § 56:8-1(d).

158.    Defendants used and employed unconscionable commercial practices, deception, fraud, false pretenses, false promises and misrepresentation, and knowingly concealed, suppressed and omitted to disclose material facts with the intent to cause plaintiffs to rely upon such concealment, suppression or omission, in connection with the sale of merchandise and in connection with their subsequent performance of their obligations to plaintiffs and have thereby violated N.J.S.A. § 56:8-2.

159.    Plaintiffs have suffered an ascertainable loss of money as a result of the defendants' violation of the Consumer Fraud Act, thereby entitling plaintiffs and the other members of the class to appropriate legal and equitable relief under N.J.S.A. § 56:8-19, including treble damages, attorneys' fees and litigation expenses.

## COUNT IX

### (Common Law Fraud)

160.    Plaintiff incorporates the allegations of Paragraphs 1 through and including 160 as if fully set forth herein.

161.    Beginning in 1990 and continuing through to the filing of this Complaint, defendants made numerous misrepresentations of material fact and omitted to disclose material information as set forth more fully above.

162.    The misrepresentations referred to above were false, were made or adopted or ratified by defendants with knowledge that they were false, and were made with the intent and expectation that plaintiffs would rely upon said misrepresentations in agreeing to participate in and continuing to participate in the VEBA plan and make substantial payments to defendants.

163.    Plaintiffs reasonably relied on the misrepresentations of defendants and defendants' material omissions in agreeing to participate in the VEBA plan and in making payments to the VEBA plan over the multi-year periods outlined above.

164.    At all times relevant thereto, defendants acted wilfully, outrageously, maliciously and with the specific intent to defraud and harm plaintiffs, and to benefit themselves, such that a significant award of punitive damages is appropriate.

## COUNT X
### (Negligent Misrepresentation)

165.    Plaintiff incorporates the allegations of Paragraphs 1 through and including 152 as if fully set forth herein.

166.    Defendants negligently failed to investigate the truth of the representations being made by themselves and/or others concerning the VEBA plan and further failed to assess the suitability of the insurance products for the purposes for which said products were being marketed to potential and existing participants.

167.    Defendants had a duty to investigate the truthfulness of the representations made by them and others before reporting those representations to plaintiffs and the other members of the class.

168.    In breach of this duty, defendants negligently recommended and endorsed the VEBA plan and/or the funding insurance products as a suitable investment for potential and existing participants by representing that physicians who purchased the insurance policies and participated in the VEBA plan were entitled to favorable tax treatment and would accumulate significant tax free retirement benefits.

169.    Plaintiffs relied upon these and false statements in agreeing to participate in the VEBA plan.

170.    Plaintiffs suffered damages as a proximate cause of the negligent misrepresentations made by defendants.

171.    To the extent the misrepresentations of or on behalf of the defendants referred to above were not made with knowledge of their falsity, said misrepresentations were made negligently.

## COUNT XII
### (Breach of Fiduciary Duty) (Plaintiffs v. Kirwan Defendants)

172.    Plaintiffs incorporate the allegations of Paragraphs 1 through and including 159 as if fully set forth herein.

173.    By virtue of the obligations of trust and confidence voluntarily undertaken by the Kirwan Defendants, the Kirwan Defendants were fiduciaries with respect to plaintiffs.

174.    The Kirwan Defendants breached their fiduciary duties to plaintiffs by, among other acts, making the misrepresentations outlined above; failing to disclose the material information referred to above, including the amount of their compensation; and by receiving unreasonable compensation.

175.    Plaintiffs have been damaged as a result of said breaches of fiduciary duty.

## COUNT XIII
## (Respondent Superior)

176.    Plaintiffs incorporate the allegations of Paragraphs 1 through and including 163 as if fully set forth herein.

177.    At all relevant times hereto, including during the course of the wrongful conduct outlined above, the Kirwan Entities were authorized agents of the PES Defendants and the Capital Defendants.

178.    In the alternative, the Kirwan Entities had apparent authority to act on behalf of the defendants.

179.    During the course of their efforts to market the VEBA plan to plaintiffs, the Kirwan Entities acted at all times with actual knowledge, authorization and approval of said defendants, and in a manner consistent with terms of their representation.

180.    As a result, Defendants are liable for the actions of the Kirwan Entities.

## COUNT XIV
## (Conspiracy and Aiding and Abetting)

181.    Plaintiffs incorporate the allegations of Paragraphs 1 through and including 168 as if fully set forth herein.

182.    To the extent any defendant did not commit the wrongful acts alleged herein, all defendants conspired to commit said acts, in furtherance of the wrongful schemes outlined herein.

183.    In the alternative, all defendants knowingly and intentionally aided, abetted, encouraged and cooperated with the other defendants in the wrongful conduct alleged herein.

WHEREFORE, Plaintiffs demand judgment against defendants for some or all of the following relief:

      a.      treble damages, attorney's fees, expert fees and costs of litigation under the New Jersey Consumer Fraud Act;

      b.      treble damages, attorneys' fees, experts fees and costs of investigation under the New Jersey Racketeering Act;

      c.      compensatory damages;

      d.      punitive damages;

      e.      an accounting with respect to the disposition of all amounts paid by plaintiffs to the VEBA plan and all compensation received by defendants;

      f.      rescission of the amounts paid or other appropriate equitable relief~

      g.      disgorgement of all compensation paid to defendants; and

      h.      interest, costs of suit, attorney's fees, and such other relief as the Court deems just and equitable.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

                ARCHER & GREINER
                A Professional Corporation
                Attorneys for Plaintiffs

By: _____
                STEVEN J. FRAM, ESQUIRE
                Pa. Attorney ID 38825

1367312v1