**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| BISHNU C. BORAH, M.D., P.C. and BISHNU BORAH, M.D., | Civil Action No. 04-3617 |
| Plaintiffs, | |
| v. | |
| MONUMENTAL LIFE INSURANCE COMPANY, et. al. | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION**
**TO THE MOTION TO DISMISS OF MONUMENTAL LIFE INSURANCE**
**COMPANY AND RELATED ENTITIES**

## INTRODUCTION

Plaintiffs submit this Memorandum of Law in opposition to the motion to dismiss that has been filed by Monumental Life Insurance Company and AEGON USA, Inc. (collectively "Monumental"). The Court should deny Monumental's motion to dismiss for insufficiency of service of process, pursuant to Fed. R. Civ. P. 12(b)(5). Contrary to the assertions made by Monumental, the Summons and Complaint in this case were timely and properly served on Monumental.

The Court should deny Monumental's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) on the grounds that the arguments raised by Monumental, including its assertion of the affirmative defense of the statute of limitations, contradict the allegations of the Complaint, which must be accepted as true in the context of this motion. The other arguments raised by Monumental should be rejected as premature or because they attempt to rely upon matters beyond the Complaint, thereby improperly attempting to convert this motion into one for summary judgment, pursuant to Fed. R. Civ. P. 56.

## FACTUAL BACKGROUND

As an initial matter, it should be noted that Monumental's brief contains numerous inaccurate and misleading assertions

concerning other lawsuits that have been brought against
Monumental and its agents arising out of the VEBA "scheme"
described by the United States Tax Court in <u>Neonatology</u>
<u>Associates, et al, v. Commissioner of Internal Revenue</u>, 115 T.C.
43 (Tax Ct. 2000), <u>aff'd</u>, 299 F.3d 221 (3d Cir. 2002).  For
example, Monumental represents that the Court presiding over two
consolidated cases, <u>Cetel v. Kirwan Financial Group, Inc.</u>, No.
00-5799 (D.N.J.) and <u>Sankhla v. Commonwealth Life Insurance Co.</u>,
No. 01-4781 (D.N.J.) (collectively the <u>Cetel</u> Litigation),
recently granted "summary judgment in favor of the Monumental
Defendants," thereby implying that all claims as against
Monumental were dismissed.  Monumental Br. at 3.  In actuality,
the Hon. Anne E. Thompson dismissed some but not all of the
claims in those cases as barred by various statutes of
limitations, but permitted two of the plaintiffs in the <u>Cetel</u>
Litigation to proceed with many of their claims, including
certain of their claims against the Monumental Defendants.  <u>See</u>
Verification of Steven J. Fram, Esquire and Exhibits "A" and "B"
thereto.

After Judge Thompson granted in part and denied in part the
motions for summary judgment of the defendants, the remaining
plaintiffs in the <u>Cetel</u> Litigation and Monumental entered into a
Settlement Agreement pursuant to which a Consent Judgment was
entered against Monumental for over $140,000.00.  <u>See</u> Fram Ver.,

Exhibit "C."  The claims of the remaining Cetel plaintiffs against the defendants who have not settled will proceed to trial before Judge Thompson on January 4, 2005.  Id. at ¶ 6.

Monumental also distorts the nature of the proceedings in the Cetel Litigation in describing the grounds upon which Judge Thompson granted summary judgment on statute grounds.  As discussed in more detail below, the facts specific to the plaintiffs in the Cetel Litigation are very different from those involving the plaintiffs in this case.  Unlike the plaintiffs in the Cetel Litigation, the plaintiffs in this case were not audited by the IRS because of their participation in the VEBA program in 1995, were not made aware of IRS Notice 95-34 shortly after it was issued, and did not incur any damages by virtue of having to defend against IRS tax audits.  As a consequence, the facts relied upon by Judge Thompson in holding that certain of the claims of certain of the plaintiffs in the Cetel Litigation accrued in 1995 do not exist in this case.

As discussed below, it would be improper, and inconsistent with Rule 12(b)(6), for this Court to rely upon factual findings made in a different case, involving different plaintiffs and different circumstances, in ruling on any issues relating to these plaintiffs.

**ARGUMENT**

**A.  Monumental Was Properly Served.**

Monumental contends that it was not properly served for two reasons.  First, it asserts that service was not timely made because Rule 4(e), which allowed plaintiff to rely upon Pennsylvania law in making service, required plaintiffs to effect service within 90 days, as provided in the Pennsylvania Rules of Civil Procedure, rather than within 120 days, as specifically provided in Rule 4(m).  As discussed below, this attempt to confuse the provisions of Rule 4(e), which provides a method of service, which the provisions of Rule 4(m), which specifies the time for service, must be rejected.

Second, Monumental argues that service addressed to its President by certified mail, return receipt requested, was not effective because the employee of Monumental who signed the receipt for its President was not authorized to do so.  As discussed below, this argument is frivolous Employees of Monumental who are generally authorized to accept mail on behalf of its President, and who did so in this case, cannot be deemed unauthorized to accept process after the fact.

With respect to the timing of service, Monumental argues, without citing any authority, that Rule 4(e), which allows a plaintiff to effect service "pursuant to the law of the state in which the district court is located," incorporates all aspects

of state procedure for service, including the 90-day provision
for service contained in Rule 404 of the Pennsylvania Rules of
Civil Procedure, thereby displacing the 120-day time period set
forth in Rule 4(m).  In <u>Henderson v. United States</u>, 517 U.S. 654
(1996), the United States Supreme Court made clear that the 120-
day time limit is the minimum amount of time allowable to a
plaintiff to effect service.  In <u>Henderson</u>, an admiralty case
brought against the Government, the Government had argued that a
provision in the Suits in Admiralty Act that required service to
be made on the United States "forthwith," controlled over the
120-day period contained in what was then Rule 4(j).  The
Supreme Court categorically rejected this argument, noting that
Rule 4, when read in its historical context, establishes "that
the 120-day provision operates not as an outer limit subject to
reduction, but as an irreducible allowance."  The Court added:

> The Federal Rules thus convey a clear message:
> Complaints are not to be dismissed if served within
> 120-days, or within such additional time as the court
> may allow.

517 U.S. at 663.

The absurdity of incorporating shorter state time limits
for service of process into federal practice under Rule 4(e) is
made clear if one considers the waiver of service provisions of
Rule 4(d).  Under Rule 4(d)(2)(f), a defendant asked to waive
formal service is entitled to a "reasonable" time to return the

waiver, which shall be at least 30 days from the date in which the request is sent, or 60 days from the date if the defendant is outside the United States. Under Monumental's interpretation of Rule 4(e), which would apply the 60-day period for service provided under the laws of some states, such as Iowa and Maryland, a defendant could fail to respond to a request for waiver of service within 60 days and then contest the timeliness of service if a plaintiff attempted to rely upon the provisions of Rule 4(e) and serve pursuant to the law of one of the states. Any such interpretation would be inconsistent with the structure of Rule 4 and would defeat its goal of attempting to simplify service of process and eliminate the type of gamesmanship represented by Monumental's argument.

Instead, Rule 4(e) must be read as allowing reliance upon the method of service allowed under applicable state law, rather than as incorporating wholesale into the Federal Rules all state law provisions dealing with service of process. Rule 404 of the Pennsylvania Rules of Civil Procedure allows service upon an out-of-state defendant by mail in the manner set forth in Rule 403, which provides for service by any form of mail requiring a "receipt signed by the defendant or his authorized agent." Rule 403 further provides that if the mail is returned with a notation by the postal authorities that the defendant refused to accept the mail, the plaintiff may serve by ordinary mail.

Plaintiffs served by certified mail, return receipt requested and, as indicated in the return of service filed with the Court, and as admitted by Monumental, the summons and Complaint were accepted and received by Monumental's and delivered to its President. Because the postal authorities did not advise Plaintiffs that Monumental had refused to accept delivery, there was no need for Plaintiff to follow through, as provided by Rule 403(1), with service by ordinary mail.

Monumental's argument that its employee who signed for the certified mail addressed to its President was not authorized must also be rejected. The Courts have consistently held, in indistinguishable circumstances, that individuals who accept service for corporate officers are impliedly authorized to do so, and that their corporate employers cannot later claim otherwise. See, e.g., LSJ Investment Co. v. O.L.D., Inc., 167 F.3d 320 (6th Cir. 1999) (service by registered mail that was signed by a woman who worked at the address given by the business complied with both the Ohio Rules and due process); Sellens v. Telephone Credit Union, 189 F.R.D. 461 (D. Kan. 1999) (where secretary told process server she could accept summons and signed for summons, service was effective absent a showing of prejudice); Kuhlik v. Atlantic Corp., 112 F.R.D. 146 (S.D.N.Y. 1986) (receptionist at corporate offices who stated that she could accept summons was an implied agent authorized by

appointment and capable of accepting service); _Frank Keevan &
Sun, Inc. v. Callier Steel Pipe & Tube, Inc._, 107 F.R.D. 665
(S.D. Fla. 1985) (where a corporate manager had actual knowledge
of action, service upon receptionist and substituted service on
manager's cousin were sufficient).

That certified mail addressed to Monumental's President was
accepted and signed for by one of its employees is _prima facie_
evidence that the employee was authorized to accept service
directed to him. Monumental's after-the-fact attempt to claim
that its employee was not authorized should be rejected.

At the very least, the circumstances raise an issue of fact
about the scope of those employees. It is well-settled that
where issues concerning authority to accept service exist,
discovery should be allowed and the Court should conduct a
hearing pursuant to Fed. R. Civ. P. 12(d) to resolve any factual
issues that may exist. 5B Wright & Miller, _Federal Practice and
Procedure, Civil 3d_ (2004), § 1353 at pp. 344-46 and nn. 37-41.
As a consequence, unless the Court rejects Monumental's lack of
authority argument, plaintiffs should be granted leave to take
discovery of Monumental concerning the nature and scope of
authority of employees at Monumental to accept documents
directed to its President.

**B.** **Choice of Law.**

Monumental argues that plaintiffs' claims under the New Jersey Consumer Fraud Act and the New Jersey Racketeering Act must be dismissed because this case is governed by Pennsylvania law. Although Plaintiffs disagree with this assertion, they also believe that it is premature for the Court to adjudicate this issue. Because choice of law issues are fact-specific, plaintiffs respectfully submit that choice of law considerations should not be addressed based upon the allegations of the Complaint but should await a more complete development of the relevant facts in this case.

Moreover, to the extent the Court decides that the law of Pennsylvania rather than New Jersey applies to the transactions at issue in this case, plaintiffs have the right to pursue analogous claims against defendants under Pennsylvania law. It would be inappropriate for any claims to be dismissed on the merits.

By way of background, there can be no question that the VEBA program at issue in this litigation was based in New Jersey, and that that program was marketed by defendants Barry Cohen and Michael Kirwan as the "authorized" representatives of The Medical Society of New Jersey, a New Jersey-based entity that represents the interests of New Jersey physicians. The evidence will establish that The Medical Society assisted Cohen

and Kirwan by advertising the VEBA program heavily, not only to New Jersey physicians, but also to physicians located in other jurisdictions. Plaintiffs are in possession of voluminous documentation which demonstrates the integral role played by The Medical Society in endorsing and marketing the VEBA program. The central role of The Medical Society is reflected in the fact that most of the physicians who agreed to participate in the program, and all of the physicians who were audited by the IRS, were located in New Jersey. The physicians who agreed to participate in the VEBA program did not know, and could not have known, the roles played by the other defendants, including Monumental, in the scheme.

Under these circumstances, which plaintiffs are prepared to outline in detail, plaintiffs are entitled to pursue claims under the New Jersey Consumer Fraud Act and the New Jersey Racketeering Act. The decision in Boyes v. Greenwich Boatworks, Inc., 27 F. Supp.2d 543 (D.N.J. 1998), involves circumstances strikingly similar to those presented here. The plaintiff, a resident of New Jersey, purchased a boat from the defendant, a New Jersey seller, after attending the 1995 Philadelphia Boat Show, which was held at the Philadelphia Civic Center in January of 1995. After the boat failed to operate as represented by the defendant, the plaintiff filed suit alleging, among other things, violation of the New Jersey Consumer Fraud Act. After a

review of the facts and circumstances, Judge Irenas held that
New Jersey law, including its Consumer Fraud Act, applied to the
plaintiff's claims. Judge Irenas noted, before considering the
appropriate choice of law, that litigation in the modern
commercial world "often implicates transactions or events
occurring in more than one jurisdiction." Id. at 546. After
considering the interest in New Jersey in regulating the conduct
of its residents, the Court held that the Consumer Fraud Act was
properly applied to wrongful conduct that occurred in New
Jersey, even where some aspects of the transaction took place
outside New Jersey or affected non-New Jersey residents:

> This Court has little doubt that the New Jersey
> Legislature intended its consumer fraud statute to
> apply to sales made by New Jersey sellers even if the
> buyer is an out-of-state resident and some aspect of
> the transaction took place outside of New Jersey.
> Courts have declared that the Consumer Fraud Act
> "should be construed liberally in favor of protecting
> consumers."  . . .  While there can be no doubt that
> the New Jersey Legislature desired to protect its own
> residents, it is equally clear that this state has a
> powerful incentive to insure that local merchants deal
> fairly with citizens of other states and countries.  .
> . .

Id. at 547 (citations omitted).

As part of his opinion, Judge Irenas considered and
rejected the defendants' argument that plaintiffs' consumer
fraud claim should be considered under the Pennsylvania Unfair
Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S.
§ 201-1 et seq.  After noting that the New Jersey Consumer Fraud

Act is somewhat more protective of the rights of consumers than UTPCPL, Judge Irenas held that it would not conflict with any policies of Pennsylvania to apply the Consumer Fraud Act. Both statutes, the Court noted,

> reflect the legislative determination to attack the same evil. Because plaintiff has chosen to invoke the remedies of the New Jersey law, a reasonable interpretation of the statute suggests that it was meant to apply to New Jersey sellers, and nothing in the law is in conflict with or repugnant to Pennsylvania law. This court will apply such law in the resolution of this case.

Id. at 548.

In Fresh Start Indus. v. ATX Telecommunications Serv., 295 F. Supp.2d 521 (E.D. Pa. 2003), Judge Robreno recently undertook a similar analysis of the New Jersey Consumer Fraud Act and the UTPCPL in holding that the Consumer Fraud Act could be applied to claims asserted in this Court by a Delaware company against a company based in New Jersey. In response to litigation instituted in this Court by Fresh Start Industries, a New Jersey company, ATX Telecommunications Services, which is based in Delaware, asserted by way of counterclaim that Fresh Start had violated the New Jersey Consumer Fraud Act. After a detailed comparison of the Consumer Fraud Act and the UTPCPL, Judge Robreno held that application of the Consumer Fraud Act to the conduct of the New Jersey-based company would not impair any governmental interest of Pennsylvania, and that "the conflict

between the New Jersey and Pennsylvania Consumer Fraud statutes is a false conflict." Id. at 528. Based upon this conclusion, the court denied Fresh Start's motion for summary judgment, ruling that ATX could proceed with claims under the Consumer Fraud Act.

Boyes and Fresh Start make clear that activities of New Jersey-based companies that adversely impact plaintiffs in other jurisdictions may be the basis for claims under the Consumer Fraud Act, and that the governmental interests of Pennsylvania represented by the UTPCPL are not inconsistent with the Consumer Fraud Act.

The sole case cited by Monumental in support of its argument on this point, the unpublished decision in Heindel v. Pfizer, Inc., 2004 WL 1398024 (D.N.J. June 7, 2004), is easily distinguishable. In Heindel, the plaintiffs, residents of Pennsylvania, asserted personal injury claims against a group of major drug manufacturers arising out of their activities in seeking FDA approval for, and their marketing of, Celebrex and Vioxx. The Plaintiffs were treated by physicians in Pennsylvania and read advertising about Celebrex and Vioxx in Pennsylvania. With respect to Merck, which manufactured Vioxx, the Court made specific findings that the employees of Merck responsible for interacting with the FDA regarding Vioxx were all located in Pennsylvania. With respect to drug companies

13

involved in the sale of Celebrex, the court found that virtually all of the promotional activities relating to Celebrex took place in New York or Illinois.  The court noted, in summary, that the defendants' contacts with New Jersey were essentially limited to the presence in New Jersey of the principal places of business of two of the defendants, and that virtually all of the marketing and advertising functions at issue in the lawsuit took place in other states.  Based upon a detailed analysis of these and other factors, the court held, on balance, that the laws of Pennsylvania should govern the plaintiffs' claims.

Heindel is factually distinguishable from this case because the activities of the defendants challenged by the plaintiffs did not take place in New Jersey.  Moreover, Heindel underscores that it is inappropriate for courts to undertake a choice of law analysis, which generally involves a detailed examination of the facts relating to a case, in the context of a 12(b)(6) motion.

Although plaintiffs have made certain representations in this brief concerning the centrality of New Jersey to the wrongful conduct alleged, the timing of Monumental's motion to dismiss, which was filed on the eve of the Christmas holiday, has not permitted plaintiffs to develop in detail all of the facts and circumstances that bear upon the choice of law analysis.  Because of the fact-intensive nature of that analysis, the Court should defer any consideration of the law

14

that should be applied to plaintiffs' claims against the various defendants.

If for any reason this Court does conclude that plaintiffs' consumer fraud claims are not governed by the New Jersey Consumer Fraud Act, plaintiff should be permitted to pursue consumer fraud claims under the UTPCPL.

The same reasoning that justifies permitting plaintiffs to pursue claims under the New Jersey Consumer Fraud Act also allows Plaintiffs to pursue claims under the New Jersey Racketeering Act. Because the activities by which the defendants created and marketing the VEBA scheme were coordinated by the New Jersey Medical Society, which endorsed the VEBA program, and took place in New Jersey, the defendants had sufficient contact with New Jersey to warrant the assertion of claims under that statute.

## C.    <u>Plaintiffs' Claims are Not Time-Barred.</u>

Monumental also argues that plaintiffs' claims should be dismissed as time-barred. This argument, which is based entirely upon factual findings made by a different court in a different case involving different plaintiffs, must be rejected. In Judge Thompson's opinions in the <u>Cetel</u> litigation, from which Monumental quotes selectively, Judge Thompson found that the claims of the <u>Cetel</u> plaintiffs accrued in 1995 because those

plaintiffs were audited by the IRS beginning in 1995, because
those plaintiffs suffered actual damages relating to their
audits in 1995, and because those plaintiffs knew or should have
known, by virtue of IRS Notice 95-34, that misrepresentations
had been made to them by certain of the defendants.

The factual findings made by Judge Thompson in the Cetel
Litigation have no bearing on when the claims of the plaintiffs
in this case accrued.  Unlike the plaintiffs in the Cetel
Litigation, Dr. Borah was never audited by the IRS and was never
aware of IRS Notice 95-34.  Instead, the Complaint alleges that
Dr. Borah only recently learned, based upon other litigation
against the defendants brought by other victims of the VEBA
scheme, that he had been fraudulently induced to participate in
the VEBA Plan and had lost most, if not all, of his
contributions to the VEBA program.  See Complaint at ¶ 97.
Although the Complaint does not specify when Dr. Borah learned
about the VEBA scheme or that he had suffered financial losses,
counsel can represent, and prove through an affidavit of Dr.
Borah if necessary, that Dr. Borah did not discover either that
he had been injured or of the wrongful nature of the defendants'
conduct until mid-2003, when he became aware of the Cetel
Litigation.

It is well settled, under both federal law and Pennsylvania
law, that a cause of action does not accrue, and the statute of

limitations does not begin to run, until a plaintiff discovers that she has been injured and the cause of the injury.  Thus, in Forbes v. Eagleson, 228 F.3d 471 (3d Cir. 2000), the Third Circuit adopted an "injury discovery" rule for the purposes of determining when the statute begins to run on civil RICO claims. Under that rule, the limitations period begins to run when the Plaintiff "has discovered, or by exercising reasonable diligence, should have discovered (1) that he or she has been injured, and (2) that this injury has been caused by another party's conduct."  Id. at 485 (quoting Oshiver v. Levine, Fishbein, Sedrin & Berman, 38 F.3d 1380, 1386 (3d Cir. 1994)).

Similarly, under the discovery rule as applied under New Jersey law, the statute of limitations does not begin to run until the plaintiff reasonably should have known of the existence of the potential cause of action.  Thus, a cause of action for fraud accrues and the statute begins to run only when a plaintiff discovers both that she has been injured and the cause of the injury:

> The plaintiff must be aware of an injury and
> a causal relationship between the injury and
> an actor, but need not know that the conduct
> is tortious or legally wrongful.  . . .
> When the gist of the action is fraud
> concealed from the plaintiff, the statute
> begins to run on discovery of the wrong or
> facts that reasonably should lead the
> plaintiff to inquire into the fraud.

Southern Cross Overseas v. Wah Kwong Shipping, 181 F.3d 410, 425 (3d Cir. 1999). See also Holmin v. T.R.W., Inc., 330 N.J. Super. 30, 36, 748 A.2d 1141 (App. Div. 2000) ("until a plaintiff has suffered 'damages,' . . . he cannot maintain a suit for damages based on fraud since his cause of action has not yet accrued. It will accrue only when 'damage' is inflicted."), aff'd, 167 N.J. 205, 770 A.2d 283 (2001).

The discovery rule is essentially the same under Pennsylvania law. See, e.g., Murphy v. Saavedra, 560 Pa. 423, 426, 746 A.2d 92, 94 (2000); Pocono International Raceway, Inc. v. Pocono Produce, Inc., 503 Pa. 80, 84, 468 A. 2d 468, 471 (1983). Under the discovery rule, the limitations period begins to run only when the plaintiff knows, or reasonably should know, "(1) that he has been injured, and (2) that his injury has been caused by another party's conduct." Urland v. Merrill-Dow Pharmaceuticals, Inc., 822 F.2d 1268, 1271 (3d Cir. 1987).

Because affirmative defenses such as the statute of limitations are fact-specific and often rely upon information outside of the pleadings, they generally may not be raised in pre-answer motions brought under Rule 12(b). See Worldcom, Inc. v. Graphnet, Inc., 343 F.3d 651, 657 (3d Cir. 2003)("Affirmative defenses should be raised in responsive pleadings, not in pre-answer motions brought under Rule 12(b)"). The Third Circuit has held that a statute of limitations defense may be raised in

a motion under Rule 12(b)(6) "only if the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations." Robinson v. Johnson, 313 F.3d 128, 135 (3d Cir. 2002). Thus, unless a complaint affirmatively alleges that a cause of action accrued beyond the limitations period, it is improper to grant a motion to dismiss based upon the affirmative defense of the statute:

> When the applicability of the statute of limitations in is in dispute, there are usually factual questions as to when a plaintiff discovered or should have discovered the elements of its cause of action, and thus "defendants bear a heavy burden seeking to establish as a matter of law that the challenge claims are barred.

Southern Cross Overseas, 181 F.3d at 425 (3d Cir. 1999) (quoting Van Buskirk v. Cary Canadian Mines, Ltd., 760 F.2d 481, 498 (3d Cir. 1985)).

The Seventh Circuit recently had occasion to apply these principles in reversing the dismissal of a Section 1983 claim as barred by the statute of limitations. In Clark v. City of Braidwood, 318 F.3d 764 (7th Cir. 2003), the plaintiff, a landowner, complained of events that took place "in or about 1997," but did not file suit until 2001. The City moved to dismiss under Rule 12(b)(6), claiming that the Section 1983 claims were time-barred by the applicable two-year statute of limitations. The plaintiff opposed this motion by asserting,

among other things, that the City's actions constituted a "continuing violation" and, in the alternative, that he did not discover the violation until two years before suit. The Seventh Circuit reversed the dismissal of the lawsuit, emphasizing the impropriety of a ruling on the affirmative defense of the statute of limitations in the context of a Rule 12(b)(6) motion:

> The City contends that the discovery rule does not save Clark's suit because his "complaint is wanting for any reasonable inference triggering the application of the discovery rule or otherwise resulting in a totaling of the limitations." But again, a plaintiff is not required to negate an affirmative defense, such as the statute of limitations, in his complaint. And though a plaintiff can plead himself out of court if he alleges facts that affirmatively show that his suit is time-barred, . . . that is not what we have here. Clark's complaint states that the city violated his constitutional rights "in or about 1997" but it is silent as to the date of discovery.

318 F.3d at 767 (citation omitted). The Seventh Circuit added that the plaintiff "could have spared everyone this appeal if he had just alleged the specific date of discovery in his reply to the motion to dismiss . . ." Id.

In this case, plaintiffs were not required to anticipate the statute as an affirmative defense or to aver the date upon which they discovered he had been injured or that the defendants had engaged in wrongful conduct. If requested to do so by the court, counsel will file an amended complaint that affirmatively

alleges that Dr. Borah did not discover either that he had been injury or the basis for his claims until mid-2003, or will submit an affidavit to that effect.

In any event, there is no basis in the Complaint for Monumental to assert the statute of limitations as an affirmative defense. Monumental's suggestion that the Court should rely upon factual findings relating to different plaintiffs in different litigation is wholly improper. What other physicians knew is irrelevant to what Dr. Borah knew and when he knew it.

## D.    **Piercing the Corporate Veil against AEGON**

Monumental also argues that plaintiffs' claims against AEGON should be dismissed on the grounds that it is not appropriate to "pierce the corporate veil." This argument, like most of the arguments raised by Monumental, is premature and not appropriate for consideration in the context of a 12(b)(6) motion. Plaintiffs note that counsel for these defendants made this very same argument in their summary judgment motion in the Sankhla and Cetel cases, and that Judge Thompson rejected this contention. As part of the Consent Judgment between the Cetel plaintiffs and these defendants, the Cetel plaintiffs agreed to dismiss their claims against AEGON in return for the payments from Monumental reflected in the Consent Judgment.

## CONCLUSION

For the foregoing reasons, plaintiffs respectfully request

that the Court deny Monumental's motion in its entirety.

Respectfully submitted,

Archer & Greiner
Attorneys for Plaintiffs


BY: _____/s/_____
STEVEN J. FRAM, ESQUIRE (ID# 38825)
A Professional Corporation
One South Broad Street
Suite 1620
Philadelphia, PA  19107

Dated:  January 3, 2005