**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| BISHNU C. BORAH, M.D., P.C. and BISHNU BORAH, M.D., | Civil Action |
| Plaintiffs, | No. 04-3617 |
| v. |  |
| MONUMENTAL LIFE INSURANCE COMPANY, et. al. |  |
| Defendants. |  |

## VERIFICATION OF STEVEN J. FRAM, ESQUIRE

STEVEN J. FRAM hereby verifies as follows:

1.    I am a member of the Bar of this Court and am counsel of record for Plaintiffs.

2.    I am also counsel of record for the plaintiffs in certain litigation brought by other physicians against Monumental Life Insurance Company and other defendants relating to the VEBA "scheme" that is described in the Complaint in this case.

3.    Attached as Exhibit "A" to this Verification is a copy of the unpublished opinion issued on  March 2, 2004, by the Hon. Anne E. Thompson in the consolidated actions captioned as Cetel v. Kirwan Financial Group, Inc., Nos. 00-5799 and 01-4781 (D.N.J.) (the "Cetel Litigation").  In this opinion, Judge Thompson held, among other things, that the civil RICO claims of

the plaintiffs were time-barred based upon the specific facts and circumstances of the plaintiffs in that litigation.

4.    Attached as Exhibit "B" to this Verification is a copy of the unpublished opinion issued by Judge Thompson on July 16, 2004, in the Cetel Litigation.  In this opinion, Judge Thompson held, among other things, that certain of the New Jersey state law claims the plaintiffs were time-barred based upon the specific facts and circumstances of the plaintiffs in that litigation.  Judge Thompson denied the summary judgment motions of the defendants on the merits of the remaining claims.

5.    After Judge Thompson ruled that the Cetel Plaintiffs could proceed to trial with their claims against certain of the defendants, including Monumental Life, Monumental entered into a settlement agreement with the Cetel Plaintiffs which provided for the entry of the Consent Judgment attached as Exhibit "C" to this Verification.

6.    At this point the remaining claims of the Cetel Plaintiffs are scheduled to proceed to trial before Judge Thompson on Tuesday, January 4, 2005.

I hereby verify under penalty of perjury that the forgoing is true and correct.  Executed on January 3, 2005.

STEVEN J. FRAM

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| KAREN CETEL, et. al., | : | |
| Plaintiffs, | : | Civil No. 00-5799 (AET) |
| v. | : | OPINION |
| KIRWAN FINANCIAL GROUP, INC., et. al., | : | |
| Defendants. | : | |

THOMPSON, U.S.D.J.

This matter is before the Court on the separate motions of certain Defendants for summary judgment pursuant to Fed. R. Civ. P. 56, and on the motions of Plaintiffs and certain Defendants to apply the doctrine of collateral estoppel. The following Defendants have filed motions for summary judgment: "Monumental Defendants" (Commonwealth Life Insurance Company, Monumental Life Insurance, Peoples Security Life, Capital Holding Company, Providence Life Insurance, and AEGON USA, Inc.); "CJA Defendants" (Raymond G. Ankner, CJA Associates, and Beaven Companies, Inc); "Murphy Defendants" (Donald Murphy, Pacific Executive Services, and DSM, Inc); and Defendant Medical Society of New Jersey. Plaintiffs Vijay Sankhla. M.D., Yale Shulman, M.D., Yale Shulman, M.D. P.A., Boris Pearlman, M.D., Denville Radiology, P.A., Marvin Cetel, M.D., Marvin Cetel, M.D. P.A., Barbara Schneider, M.D., and Barbara Schneider, M.D. P.A. (collectively referred to as "Plaintiffs"), the Murphy Defendants, and Defendant Medical Society have filed motions for collateral estoppel.

This Court has reviewed the voluminous submissions of the parties and heard oral argument on February 23, 2004. For the reasons outlined below, Defendants' motions for summary judgment will be granted, the motions for collateral estoppel will be denied, and the Court will reinstate Plaintiffs' state law claims.

BACKGROUND

Plaintiffs, physicians and their professional corporations, assert that Defendants (insurance companies, insurance salespersons, financial services companies, and financial planners) misrepresented to them the potential tax benefits of voluntary employee beneficiary associations ("VEBAs") in order to induce them to fund pre-retirement and post-retirement death benefits for their employees through the purchase of life insurance. A VEBA, as defined in I.R.C. § 501(c)(9), is a tax-exempt program providing members, their dependents, or designated beneficiaries with life, sick, accident, or other benefits "if no part of the net earnings of such association inures (other than through such payments) to the benefit of any private shareholder or individual."

In short, Plaintiffs allege that Defendants marketed the VEBAs as creating a tax deduction for the employer's contributions to an employee welfare benefit plan and a permanent tax deferral for the employees. Under the VEBA plans, the employer (Plaintiffs' professional corporations) would purchase, and deliberately overpay for, group life insurance for its employees (the Plaintiff-physicians). The annual contributions used to purchase the policies were supposed to be tax deductible, and the employees, by later converting the group life insurance policies to individual policies, were supposed to realize any premium overpayments as tax conversion credits. Thus, Plaintiffs would realize two tax benefits under Defendants' VEBA

2

plans: (1) their professional corporations would be able to deduct the life insurance premium payments, and (2) when the individual Plaintiffs, as employees of their professional corporations, converted the group life insurance polices to individual policies, they would realize the insurance overpayments as conversion credits.

Plaintiffs allege that in or about 1990, the Murphy Defendants and CJA Defendants conceived of the VEBA plans to take advantage of the Tax Reform Act of 1986. Defendant Michael Kirwan and his company, Defendant Kirwan Financial Group ("Kirwan Defendants"), and one of Kirwan Financial's longtime insurance salesmen and financial advisors, Defendant Barry Cohen, were enlisted by CJA and the Murphy Defendants to assist them in marketing the VEBA plans to medical professionals, such as Plaintiffs. Plaintiffs began participating in Defendants' VEBA plans around 1990.

The insurance policies which formed the backbone of the VEBA plans were originally provided by non-party Inter-American Insurance Company. Plaintiffs allege that in 1991, Monumental Defendants entered into an agreement with the Murphy and CJA Defendants to market Monumental's insurance products to fund the VEBAs.

Defendant Medical Society of New Jersey is a professional organization of physicians in New Jersey. It is involved in this case because it endorsed VEBA plans to its physician members from 1990-1995. In exchange for its endorsement, the Medical Society received royalties generated by the sale of VEBA plans to its members. Coincidently, Plaintiff Yale Shulman was on the Medical Society's Committee on Membership Services which approved the Society's endorsement of VEBAs at issue in this matter.

The Internal Revenue Service (IRS), however, had a somewhat different view of the

3

legality of the VEBA plans. On June 5, 1995, the IRS issued Notice 95-34 which announced that the IRS did not consider the VEBAs' tax avoidance mechanism to be in compliance with the tax code. In that notice, the IRS informed the public that it had disallowed such deductions and was asserting its position in litigation. In 1994 and 1995, the IRS issued deficiency notices to all of the Plaintiffs or their VEBA plans. Subsequent to these notices, the IRS conducted audits of the Lakewood Plan (Plaintiff Sankhla's plan) and the other individual Plaintiffs. The IRS determined that Plaintiffs' VEBA plans contravened the tax code and assessed deficiencies and penalties.

In Neonatology Associates, P.A. et al v. Comm'r of Internal Revenue, 115 T.C. 43 (2000), aff'd 299 F.3d 221, 234 (3d Cir. 2002), the Tax Court agreed with the IRS's assessment of the VEBA plans and found that the VEBAs at issue in this matter were frameworks that circumvented the intent and provisions of the Internal Revenue Code.[1] Essentially, these plans allowed Plaintiffs' corporations to pay inflated life insurance premiums so that the excess contributions would be available for redistribution to the individual shareholders free of income taxes. The decision of the Tax Court was substantial for the petitioners because their professional medical corporations were denied deductions they had taken for the contributions and the individuals were charged with significant additional taxable dividend income. The court

---

[1]The Neonatology litigation initially involved 20 groups of physicians, including Plaintiffs, who, through their medical groups, had participated in Defendants' VEBA plans. Because all of the different parties shared the basically the same facts as far as the jurisdiction of the Tax Court, two of these groups of physicians and their professional corporations were selected as a "test" case. Neonatology, 115 T.C. at 44. Plaintiffs were not part of the "test" case, although Plaintiff Sankhla's employer group, Lakewood Radiology, was one of the "test" petitioners.

held further that the individual taxpayers were liable for accuracy-related negligence penalties under I.R.C. § 6662(a).

Plaintiffs' complaint alleges violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., and various state law claims. This matter comprises two consolidated cases: Cetel, et al. v. Kirwan Financial, et al., Civ. No. 00-5799 (AET), and Sankhla v. Commonwealth Life, et al., Civ. No. 01-4781 (AET). The Cetel action was filed on July 20, 2000 and Sankhla was filed on September 6, 2001. On July 8, 2002, this Court entered an Order dismissing Plaintiffs' state law claims as being preempted by ERISA. The two cases were consolidated on November 25, 2002. On January 9, 2004, as per the scheduling order, parties submitted summary judgment motions.

## DISCUSSION

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1366 (3d Cir. 1996). Summary judgment is to be granted against the non-moving party when that party has failed to make a sufficient showing, after discovery, establishing an element of her claim that is essential to her case, and on which the non-moving party will bear the burden of proof at trial. Celotex, 477 U.S. at 322. In reviewing motions for summary judgment, the evidence is viewed in a light most favorable to the nonmovant. InterVest, Inc. v. Bloomberg, L.P., 340 F.3d 144, 159-60 (3d Cir. 2003).

I. RICO Statute of Limitations and Accrual

All Defendants who filed summary judgment motions contend that they are entitled to summary judgment on all of Plaintiffs' RICO claims, because those claims are time-barred.[2] Under RICO, it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). While RICO is a criminal statute, 18 U.S.C. § 1964(c) provides that private parties may bring civil actions under its provisions. The general purpose of civil RICO actions is "to encourage plaintiffs to actively investigate potential criminal activity, 'to become prosecutors, private attorneys general' dedicated to eliminating racketeering activity." Mathews v. Kidder Peabody & Co., Inc., 260 F.3d 239, 252 (3d Cir. 2001) (quoting Rotella v. Wood, 528 U.S. 549, 557 (2000)).

Plaintiffs filed amended their complaint, adding claims for RICO violations, on March 20, 2002 . Counts III through VII allege violations of RICO. Count III through Count V of Plaintiffs' complaint allege that Defendants violated 18 U.S.C. § 1962(c), "by embezzling, stealing, or unlawfully and willfully converting to their own use the assets of any employee welfare benefit plan in violation of 18 U.S.C. § 664, and formulating a scheme or artifice to

---

[2] Plaintiffs contend that the CJA Defendants waived any statute of limitations argument by not raising it in their complaint. See Fed. R. Civ. P. 8(c) (all affirmative defenses must be pled). CJA Defendants argue that the Third Circuit applies such waivers "leniently" where there is no prejudice. See Kleinknecht v. Gettysburg College, 989 F.2d 1360, 1373 (3d Cir. 1993). CJA claims there is no prejudice here because several of its co-defendants (and alleged co-conspirators) have asserted that defense, and discovery in this case did not begin in earnest until the fall of 2003. Because there is no prejudice to Plaintiffs in permitting CJA Defendants to raise a statute of limitations defense at this point in the litigation, this Court declines to find that the CJA Defendants have waived that defense.

defraud Plaintiffs . . . and used the U.S. mails and interstate wires in furtherance of that scheme, in violation of 18 U.S.C. §§ 1341 [mails] and 1343 [interstate wires]." (Compl't ¶¶ 303, 304, 313, 314, 324, 325.) Plaintiffs claim in Count VI that Defendants violated 18 U.S.C. § 1962(c) by conducting their racketeering affairs as an "association-in-fact" enterprise. (Id. ¶332.) Count VII claims that Defendants conspired to violate RICO in violation of 18 U.S.C. § 1962(d). (Id. ¶339.) Plaintiffs contend that the "pattern of racketeering activity engaged in by Defendants began in or about 1990 and has continued to this date." (Id. ¶¶ 306, 316, 325, 334.)

A. RICO Statute of Limitations and Inquiry Notice

While RICO does not include a limitations period for civil claims, the Supreme Court has held that the four-year limitations period in civil antitrust actions seeking treble damages under the Clayton Act is applicable to RICO actions. Forbes v. Eagleson, 228 F.3d 471, 483 (3d Cir. 2000) (citing Agency Holding Corp. v. Malley-Duff Assocs., 483 U.S. 143, 156 (1987)). The Third Circuit has adopted an "injury discovery rule" whereby a RICO claim accrues (and thus the four-year statute of limitations begins to run) when "plaintiffs knew or should have known of their injury." Mathews, 260 F.3d at 250. The second part of the injury discovery rule requires a court to determine when a party "should have known" or was on "inquiry notice" of his injury. Id. at 251.

A plaintiff is deemed to be on "inquiry notice" of his RICO claims "whenever circumstances exist that would lead a reasonable investor of ordinary intelligence, through the exercise of reasonable due diligence, to discover his or her injury." Id. The Third Circuit has characterized such circumstances as "storm warnings." Id. at 251 & n.15 (citing Great Rivers Coop. of Southeastern Iowa v. Farmland Indus., Inc., 120 F.3d 893, 896 (8th Cir.1997)

7

("[I]nquiry notice exists when there are 'storm warnings' that would alert a reasonable person of the possibility of misleading information, relayed either by an act or by omission.")). In other words, "if a prudent person would have become suspicious from the knowledge obtained through the initial prudent inquiry and would have investigated further, a plaintiff will be deemed to have knowledge of facts which would have been disclosed in a more extensive investigation." Id. at 251 n.15 (quoting Gray v. First Winthrop Corp., 82 F.3d 877, 881 (9th Cir.1996)).

There is a two-part test to determine whether a plaintiff should be deemed to be on "inquiry notice" of RICO violations: (1) the defendant must establish the existence of sufficient storm warnings that would alert a reasonable person of potentially misleading information; and (2) if the defendant shows the existence of such warnings, the burden shifts to the plaintiff to show that he "exercised reasonable due diligence and yet was unable to discover his injuries." Mathews, 260 F.3d at 251-52. The Third Circuit has rejected the suggestion that summary judgment is improper when the issue of injury discovery is contested by the parties. Id. at 250 n.13. "If the facts needed in order to determine when a reasonable investor of ordinary intelligence discovered or should have discovered the fraud can be gleaned from the pleadings, a court may resolve the issue of the existence of fraud at the summary judgment phase." Id.

### 1. First Prong of Inquiry Notice

Defendants contend that a number of actions in 1995 put the Plaintiffs on inquiry notice of their RICO claims, and thus under RICO's four-year statute of limitations Plaintiffs had until 1999 to file their RICO claims. The first action occurred with the publication of IRS Notice 95-34 on June 5, 1995. This notice addressed whether contributions to employer welfare benefit funds, such as the VEBAs at issue here, were deductible. The notice made clear that "[i]n

general, these arrangements do not satisfy the requirements for exemption under [the tax code]."
(Murphy Def. Ex. 39, I.R.S. Notice 95-34.) The notice also emphasized "that the Service has
never issued a letter ruling approving the deductibility of contributions to a welfare benefit fund.
. .." Most importantly, Notice 95-34 stated that "*[t]axpayers and their representatives should be
aware that the Service has disallowed deductions for contributions to these arrangements, and is
asserting the positions discussed [in this notice] in litigation.*" (emphasis added).

In addition to Notice 95-34, the IRS issued deficiency notices and conducted audits in
relation to Plaintiffs' VEBA plans. These audits related to the deductibility of VEBA
contributions. The Lakewood Radiology Plan (Plaintiff Sankhla's plan), and Plaintiffs
Schneider, Pearlman, and Cetel received tax deficiency notices in August 1995. Plaintiff
Shulman received a deficiency notice in 1994. On the advice of Defendant Cohen, the financial
advisor who sold them the VEBA plans, Plaintiffs individually retained attorney Neil Prupis, a
former defendant in this case, to represent them in relation to the audits. In addition, upon
learning of Notice 95-34 and the IRS audits, the Medical Society of New Jersey, Plaintiffs'
professional organization, stopped endorsing Defendants' VEBA plans.

The Court finds that IRS Notice 95-34 and the IRS audits of Plaintiffs in connection with
that notice were sufficient storm warnings of potential problems with the VEBA plans and of the
facts underlying Plaintiffs' RICO claims. Notice 95-34 was a warning from the IRS that it did
not consider such tax benefits to be legal under the tax code. The notice also stated that the IRS
had disallowed such deductions and was pursuing its position in litigation. It also strains
credulity for Plaintiffs to reason that the 1995 IRS audits of the very plans at issue here, after an
IRS Notice calling into question the legality of such plans and informing participants of ongoing

9

litigation, were not "Category V (extreme)" hurricane warnings.

Moreover, Plaintiffs' RICO claims center on the allegation that Defendants engaged in a scheme to willfully misrepresent the tax consequences of the VEBA plans to induce Plaintiffs to participate. If the primary purpose of the VEBA plans was tax savings, and Defendants had represented from the beginning that the tax benefits were legal, then any challenge to that assertion by the IRS should have set off alarms. Thus, in 1995, there is no question that sufficient "storm warnings" existed to put Plaintiffs on notice that the tax benefits which formed the basis of the VEBAs rested on extremely dubious legal grounds, and that Defendants may have misrepresented the legality of those plans.

### 2. Second Prong of Inquiry Notice

The second prong of the "inquiry notice" analysis requires a plaintiff to show that she exercised "reasonable due diligence" and yet was unable to discover her injuries. Mathews, 260 F.3d at 252. The second prong comports with the general purpose of civil RICO actions "to encourage plaintiffs to actively investigate potential criminal activity, 'to become prosecutors, private attorneys general' dedicated to eliminating racketeering activity." Id. (quoting Rotella, 528 U.S. at 557). A plaintiff must first show that he investigated the suspicious circumstances; then the court must determine whether those efforts were adequate - "i.e. whether they exercised the due diligence expected of reasonable investors of ordinary intelligence." Id. Unsophisticated persons will not be held to a lower standard of diligence. Id. (quoting Rotella, 528 U.S. at 557). If storm warnings exist and a plaintiff refuses to investigate them, a court is to find that plaintiff on inquiry notice of his claims. Id. at 252 n.16.

Plaintiffs essentially contend that they were relieved of their duty to investigate because

10

Defendant Cohen and Prupis "insisted that the IRS was on a 'witch-hunt'", and that Defendants "encouraged Plaintiffs to challenge the IRS and continue to participate in the VEBA plan." (Pl. CJA Brief at 10.) Plaintiffs conclude that "[b]ased on Defendants' ongoing representations, Plaintiffs had every expectation that they would receive the benefits promised to them by Defendants and that the IRS would lose the Tax Court case." (Id.) Plaintiffs also make the assertion that so long as "legal remedies" existed that would exonerate the VEBA plans, any RICO injury would have been "speculative" at that point. (Id.) In addition, at oral argument, Plaintiffs' counsel went to great lengths to argue that Plaintiffs' lack of awareness of their RICO injuries is evidenced by the fact that Plaintiffs continued to participate in the VEBA plans after the IRS notices and audits.

This part of the "inquiry notice" analysis requires a plaintiff to establish that she exercised "reasonable due diligence" in light of the storm warnings. In Forbes, the plaintiffs hired an investigator who made numerous inquiries and requested financial documents not only from the defendant but from related parties. 228 F.3d at 479. In contrast, Plaintiffs have not alleged that they engaged in any due diligence beyond seeking the advice of Defendant Cohen, their financial advisor, and Neil Prupis, a lawyer to whom Cohen referred Plaintiffs.

It seems incredible for sophisticated, educated physicians and businesspeople to argue that they relied solely on Defendants' assurances of a "victory" over the IRS in the Tax Court. Moreover, it is very clear that Defendants had their own self-interest in the continued viability of the VEBA plans. Defendants were heavily involved in such plans and had strongly represented the VEBAs as legitimate tax avoidance methods. The second part of the inquiry notice test puts the burden squarely upon the shoulders of Plaintiffs to investigate any potential problems.

11

Asking Defendants whether the plans were legal does not constitute reasonable due diligence. In addition, the fact that Plaintiffs continued to contribute to the VEBA plans at issue after notice 95-34 and the IRS audits was patently unreasonable. The Court finds that a reasonable person would not continue to participate in a tax avoidance scheme after the IRS issues a notice condemning such plans, and that person was the subject of an IRS audit of his participation in that plan.

In the Neonatology litigation, the Third Circuit commented on the conduct of the physician-petitioners, when discussing whether it was appropriate for the Tax Court to impose "negligence-related" penalties on the them:

> [w]hen, as here, a taxpayer is presented with what would appear to be a fabulous opportunity to avoid tax obligations, he should recognize that he proceeds at his own peril. In this case, [Murphy Defendants] devised a program which it marketed as "creat[ing] a tax deduction for the contributions to the employee welfare benefit plan going in and a permanent tax deferral coming out." As highly educated professionals, the individual taxpayers should have recognized that it was not likely that by complex manipulation they could obtain large deductions for their corporations and tax free income for themselves.

Neonatology Associates, P.A. v. Comm'r Internal Revenue, 299 F.3d 221, 234 (3d Cir. 2002). According to this analysis, Plaintiffs should have been on notice of potential problems from the first time they were introduced to the VEBA plans.

Moreover, under the theory propounded by Plaintiffs' complaint, any damages Plaintiffs might have had in 1995 would have been "concrete." By that point they had been contributing to the VEBA plans since 1990. Certainly, it would be possible for an accountant to determine any deficiency Plaintiffs would have had to remit to the IRS, along with any penalties. Such damages may have then been available in the RICO context.

B. Equitable Tolling

Plaintiffs contend that regardless of Notice 95-34 or the IRS audits, the statute of limitations for their RICO claims was tolled because of Defendants' fraudulent concealment of their racketeering activity. "Fraudulent concealment is an 'equitable doctrine [that] is read into every federal statute of limitations.'" Davis v. Grusemeyer, 996 F.2d 617, 624 (3d Cir. 1993). The Supreme Court has indicated that RICO's four-year limitation period can be tolled "where a pattern remains obscure in the face of a plaintiff's diligence in seeking to identify it." Rotella, 528 U.S. at 561.

In order to establish fraudulent concealment, a plaintiff has the burden to show three necessary elements: (1) "active misleading" by the defendant, (2) which prevents the plaintiff from recognizing the validity of her claim within the limitations period, (3) where the plaintiff's ignorance is not attributable to her lack of "reasonable due diligence in attempting to uncover the relevant facts." Mathews, 260 F.3d at 256. However, when a plaintiff merely seeks to survive summary judgment, there need only be a genuine issue of material fact that the doctrine applies. Id. Thus, a court must determine:

> (1) whether there is sufficient evidence to support a finding that defendants engaged in affirmative acts of concealment designed to mislead the plaintiffs regarding facts supporting their RICO claims,
> (2) whether there is sufficient evidence to support a finding that plaintiffs exercised reasonable diligence, and
> (3) whether there is sufficient evidence to support a finding that plaintiffs were not aware, nor should they have been aware, of the facts supporting their claim until a time within the limitations period measured backwards from when the plaintiffs filed their complaint.

Id. Absent evidence to support these findings there is no genuine dispute of material fact on the

issue and the Defendants are entitled to summary judgment. Id.

Even assuming that the first prong of the analysis is present, that Defendants engaged in affirmative acts of concealment, Plaintiffs cannot overcome the second and third prongs, namely that they engaged in reasonable diligence and could not have been aware in 1995 of the facts supporting their RICO claims. In order to avoid summary judgment, there must be a genuine issue of material fact as to whether the Appellants exercised reasonable due diligence in investigating their claim. Id. at 257. As discussed above, Plaintiffs did not exercise reasonable diligence in investigating the tax issues surrounding the VEBAs. As to the third prong, it would be hard for Plaintiffs to argue that they could not have been aware of facts supporting their RICO claims because they did not do any investigating to find out.

## II. Collateral Estoppel

In this case parties from both sides have moved to bind their opponents via the doctrine of collateral estoppel by the findings of the Tax Court in Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43 (2000). The doctrine of collateral estoppel prevents the relitigation of issues that have been decided in a previous action. Montana v. United States, 440 U.S. 147 (1979). Also referred to as issue preclusion, the doctrine "protect[s] litigants from the burden of relitigating an identical issue with the same party or his privy and . . . promot[es] judicial economy by preventing needless litigation." Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 (1979).

Specifically, Plaintiffs seek to bind Defendants by the Tax Court's findings as to the role each played in the VEBA scheme. Defendants seek to hold Plaintiffs to the Tax Court's findings that Plaintiffs were negligent in not conducting an independent investigation into the VEBA

14

plans.

However, a trial court has broad discretion to determine whether collateral estoppel should be applied, id. at 331, and any doubts about application of collateral estoppel should usually be resolved against its use, Witkowski v. Welch, 173 F.3d 192, 206 (3d Cir. 1999) (citing Kauffman v. Moss, 420 F.2d 1270, 1274 (3d Cir.1970)). In this instance, none of the Defendants or Plaintiffs were actual parties to the Neonatology litigation, and there is some doubt as to whether any of the parties in this case had sufficient privity with the parties in Neonatology to be bound by the factual findings of that decision. This Court finds that because of the extremely complex nature of this action and the desire to address all of the issues in one proceeding, that it will not bind either the Plaintiffs or the Defendants to the factual findings of the Tax Court via the doctrine of collateral estoppel.

III. Benefit of the Bargain

Defendants also contend that summary judgment should be granted on Plaintiffs' "benefit of the bargain" damages. Under this theory, Plaintiffs are seeking to recover damages for losses incurred as a result of Plaintiffs' inability to make future contributions to VEBA programs as a result of the adverse determination by the Tax Court. Not only does this Court find that such damages would be highly speculative, such damages would require the Court to enforce what turned out to be an illegal tax avoidance scheme. Because it is a "universal rule that it is unlawful to contract to do that which it is unlawful to do," Bank of United States v. Owens, 27 U.S. 527, 538 (1829), this Court will grant summary judgment in favor of Defendants on Plaintiffs' "benefit of the bargain" theory of recovery.

## IV. Plaintiffs' Claims Under ERISA §§ 409, 502(a) (Count I)

Defendants Murphy and Monumental claim that summary judgment should be granted on Count I of Plaintiffs' complaint, as that count relates to § 409 and § 502(a)(2) of ERISA. The liability of fiduciaries is governed by § 409 of ERISA, which provides that "[a]ny person who is a fiduciary with respect to a plan who breaches any of the . . . duties imposed upon fiduciaries by [ERISA] shall be personally liable to make good to such plan any losses to the plan resulting from each such breach." 29 U.S.C. § 1109(a). Section 502(a)(2) of ERISA entitles individual participants to sue "for appropriate relief" under § 409. 29 U.S.C. § 1132(a)(2).

In Massachusetts Mutual Life Ins. Co. v. Russell, 473 U.S. 134, 140 (1985), the Supreme Court held that liability under § 409 accrues only to the plan itself, not to participants suing in their individual capacities. Thus, § 502(a)(2) in effect allows individual participants to sue "in a representative capacity on behalf of the plan as a whole." Id. at 142 n.9. Because Plaintiffs here seek to recover benefits allegedly owed to them in their individual capacities, and the employer plans are not named as plaintiffs in the complaint, summary judgment will be granted on Count I, as it relates to § 409 and § 502(a)(2) of ERISA.

## V. Plaintiffs' State Law Claims

On July 8, 2002, this Court entered an order dismissing Plaintiffs' state law claims as being preempted by ERISA. In that Memorandum and Order, this Court specifically stated that "ERISA is the appropriate mechanism through which Plaintiffs can seek relief," and that their claims for fraud and fraud in the inducement were cognizable under § 502(a) of ERISA, 29 U.S.C. 1132(a). In addition, the Court found that because all of Plaintiffs' state law claims "related to" the ERISA plans in question, that they were preempted by § 514(a) of ERISA, 29

U.S.C. 1144(a).

The dismissed claims were: New Jersey's Racketeering Act (Count VIII); Conspiracy to Violate New Jersey Racketeering Act (Count IX); New Jersey Consumer Fraud Act (Count X); unjust enrichment (Count XI); common law fraud (Count XII); negligent misrepresentation (Count XIII); breach of fiduciary duty (Count XIV); breach of contract (Count XV); breach of duty (Count XVI); respondeat superior (Count XVII); and conspiracy and aiding and abetting (Count XVIII).

Upon further reflection after discovery in this matter has been completed, it seems that the dismissal of Plaintiffs state law claims was premature. Because "[d]etermining whether a claim could have been brought under ERISA has proven to be anything but an exact science," Difelice v. Aetna U.S. Healthcare, 346 F.3d 442, 446 (3d Cir. 2003), this Court exercises its discretion under Fed. R. Civ. P. 54(b) and will reinstate Plaintiffs' state law claims.

As an initial matter, it is important to distinguish "complete preemption" under § 502(a) of ERISA, which is a jurisdictional concept, from "express preemption" under § 514(a) of ERISA, which is a substantive concept governing the applicable law. In re U.S. Healthcare, Inc., 193 F.3d 151, 160 (3d Cir. 1999) (citing Joyce v. RJR Nabisco Holdings Corp., 126 F.3d 166, 171-72 (3d Cir. 1997)). Claims that are completely preempted under § 502(a) are "necessarily federal in character," and thus are converted into federal claims. Id. (citing Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 63 (1987)). Section 514(a) provides that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . ." 29 U.S.C. § 1144(a). State law claims that are subject to express preemption are displaced and thus subject to dismissal. Id. (citing Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S.

724, 739 (1985)).

In order to determine whether Plaintiffs' state law claims are completely preempted, the Court must consider whether they "fall within the scope of" ERISA's civil-enforcement provisions." Id. at 161 (citing Dukes v. U.S. Healthcare, Inc., 57 F.3d 350, 355 (3d Cir. 1995)). Complete preemption occurs when federal law so completely preempts an entire area of law that the state cause of action is entirely displaced by federal law. Joyce, 126 F.3d at 171. The objective of this ERISA preemption clause was to remove the threat of conflicting and inconsistent state and local regulations; to "avoid a multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans." New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 657 (1995). The Court finds that in enacting ERISA, the federal government did not intend to completely preempt the areas of state law comprising Plaintiffs' state law claims.

In its July 8, 2002 Memorandum, the Court also found that Plaintiffs' state law claims, Counts VIII though XVIII were expressly preempted under § 514, because they related to the ERISA plans. "A law 'relates to' an employee benefit plan [under § 514], in the normal sense of the phrase, if it has a connection with or reference to such a plan." Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 138 (1990) (citing Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96-97 (1983)). However, "[p]re-emption does not occur . . . if the state law has only a tenuous, remote, or peripheral connection with covered plans, as is the case with many laws of general applicability." Travelers, 514 U.S. at 661. The Third Circuit has outlined a basic test to determine whether a state law relates to an ERISA plan:

A rule of law relates to an ERISA plan if it is specifically designed to affect

employee benefit plans, it if singles out such plans for special treatment, or if the rights and restrictions it creates are predicated on the existence of such a plan.

\* \* \* \* \* \*

This does not end our inquiry, however. A state rule of law may be preempted even though it has no such direct nexus with ERISA plans if its effect is to dictate or restrict the choices of ERISA plans with regard to their benefits, structure, reporting and administration, or if allowing states to have such rules would impair the ability of a plan to function simultaneously in a number of states.

Glaziers and Glassworkers Union Local No. 252 Annuity Fund v. Newbridge Securities, Inc., 93 F.3d 1171, 1185 (3d Cir. 1996) (quoting United Wire, Metal and Machine Health and Welfare Fund, et al. v. Morristown Memorial Hospital, 995 F.2d 1179, 1192-93 (3d Cir.1993)).

Here, Plaintiffs' state law claims include alleged violations of the New Jersey Racketeering Act and the New Jersey Consumer Fraud Act, unjust enrichment, fraud, negligent misrepresentation, breach of fiduciary duty, breach of contract, breach of fiduciary duty, respondeat superior, conspiracy and aiding and abetting. The gravamen of each of these counts is dependent upon whether Defendants negligently or intentionally misrepresented to Plaintiffs that the VEBA plans were legitimate tax avoidance schemes when Defendants knew, or should have known, that the plans did not.

A determination as to these counts does not require an examination of the particulars of the VEBA plans. Rather, these claims turn on the Defendants' actions outside of the ERISA context; reference to the VEBA plans will only form a backdrop to this action. Thus, Plaintiffs' claims against Defendants for actions taken to market the VEBA plans or induce Plaintiffs to establish or continue to participate in the Plan are not preempted by ERISA, and will be reinstated.

The Court understands that Defendants may desire the opportunity to file motions for summary judgment with respect to Plaintiffs' revived state law claims. Such motions are to be filed no later than March 24, 2004, and will be returnable, April 19, 2004.

19

## CONCLUSION

For the reasons discussed above, Defendants' motions for summary judgment will be granted, the motions for collateral estoppel will be denied, and Plaintiffs' state law claims will be reinstated. The accompanying order will be entered.

March 2, 2004
DATE

s/ Anne E. Thompson
ANNE E. THOMPSON, U.S.D.J.

# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| KAREN CETEL, et al., | : | |
| Plaintiffs, | : | Civil No. 00-5799 (AET) |
| v. | : | OPINION |
| KIRWAN FINANCIAL GROUP, INC., et al., | : | |
| Defendants. | : | |

|  |  |  |
|---|---|---|
| VIJAY SANKHLA, et al., | : | |
| Plaintiffs, | : | Civil No. 01-4781 (AET) |
| v. | : | OPINION |
| COMMONWEALTH LIFE INSURANCE COMPANY, et al., | : | |
| Defendants. | : | |

THOMPSON, U.S.D.J.

This matter is before the Court on the separate motions of certain Defendants for summary judgment pursuant to Fed. R. Civ. P. 56, and on the motion of Plaintiffs for reconsideration of this Court's March 2, 2004 Opinion granting partial summary judgment to Defendants. The following Defendants have filed motions for summary judgment: "Monumental Defendants" (Commonwealth Life Insurance Company, Monumental Life Insurance, Peoples

Security Life, Capital Holding Company, Providence Life Insurance, and AEGON USA, Inc.);
"CJA Defendants" (Raymond G. Ankner, CJA Associates, and Beaven Companies, Inc.);
"Murphy Defendants" (Donald Murphy, Pacific Executive Services, and DSM, Inc.); "Defendant
Medical Society" (Medical Society of New Jersey); and "Defendant Cohen" (Barry Cohen).
"Defendant Kirwan" (Michael Kirwan) has not filed any motions.

Plaintiffs Vijay Sankhla, M.D., Yale Shulman, M.D., Yale Shulman, M.D., P.A., Boris
Pearlman, M.D., Denville Radiology, P.A., Karen Cetel, Marvin Cetel, M.D., Marvin Cetel,
M.D., P.A., Morton Schneider, Barbara Schneider, M.D., and Barbara Schneider, M.D., P.A.
(collectively referred to as "Plaintiffs") have filed a motion for this Court to reconsider its March
2, 2004 Opinion, in which the Court granted summary judgment to Defendants on most of
Plaintiffs' federal claims.

This Court has reviewed the submissions of the parties and heard oral argument on May
17, 2004. For the reasons outlined below, Defendants' motions for summary judgment will be
granted in part, and Plaintiffs' motion for reconsideration will be denied.

## BACKGROUND

Plaintiffs, who are medical professionals, their spouses, and professional organizations
allege that Defendants (insurance companies, insurance salespersons, financial services
companies, and financial planners) are responsible for a fraudulent scheme to induce Plaintiffs to
participate in a complicated insurance-based retirement benefit arrangement. The parties refer to
this scheme as the voluntary employees' beneficiary association ("VEBA").

A VEBA is a tax-exempt program that provides life, sick, or accident insurance, or other
benefits to its participants, their dependents, or designated beneficiaries "if no part of the net

earnings of such association inures (other than through such payments) to the benefit of any private shareholder or individual." 26 U.S.C. § 501(c)(9). The general features of Defendants' VEBA plans are discussed in this Court's March 2, 2004 Opinion, the United States Tax Court's decision in <u>Neonatology Associates, P.A. v. Commissioner</u>, 115 T.C. 43, 49-57 (July 31, 2000) (hereinafter "<u>Neonatology I</u>"), and the United States Court of Appeals for the Third Circuit's Opinion in <u>Neonatology Associates, P.A. v. Commissioner</u>, 299 F.3d 221, 224-27 (3d Cir. 2002) (hereinafter "<u>Neonatology II</u>").

Plaintiffs began making financial contributions to Defendants' VEBA plans in the early 1990's. (Pl. SOF ¶¶ 206, 261, 314, 339; Sankhla Ver. ¶ 7.) Defendants Cohen and Kirwan, who were serving as the individual Plaintiffs' financial advisors, recommended that they participate. (Pl. SOF ¶¶ 204, 206, 210, 257, 260, 262, 303, 307, 333-39.) Plaintiffs allege that Defendants Cohen and Kirwan represented that if Plaintiffs participated in their VEBA plans, Plaintiffs would earn a significant tax deduction in the short term, and tax-free retirement income in the long term. (<u>See</u> Sankhla Compl't ¶¶ 3, 4.)

In 1995, the Internal Revenue Service ("IRS") began investigating whether the tax deductions Plaintiffs took for their VEBA contributions were allowed under the tax code. In June 1995, the IRS informed Plaintiffs Morton and Barbara Schneider that it was going to conduct audits of their personal income tax returns and the tax returns of Barbara Schneider's medical practice, Plaintiff Barbara Schneider, M.D., F.A.S.C., P.A. (Pl. SOF ¶ 213.) On June 21, 1995, the IRS issued the two examination reports, one for the Schneiders' personal taxes and one for Dr. Schneider's business. (Pl. Ex. 193, 194; Def. Ex. 107.) In those reports, the IRS listed in detail the amounts the IRS examiner determined the Schneiders owed in taxes due to

their VEBA contributions. For tax years 1992 and 1993, the reports stated that the Schneiders owed $14,942.00 in personal taxes. (Pl. Ex. 193 at 2, 3; Def. Ex. 107 at 2, 3.) The report also included $2,988.40 in negligence-related penalties and $2,324.65 in interest. (Id.) With regard to its audits of Dr. Schneider's medical practice, the IRS determined that it owed $9,414.00 in taxes, $1,882.80 in negligence-related penalties, and $1,620.94 in interest. (Pl. Ex. 194 at 2, 4; Def. Ex. 107 at 10, 12.) Thus, as of June 21, 1995, the total tax liability the IRS determined the Schneiders owed because of their VEBA contributions was $33,172.79.

The examination notice to Dr. Schneider's medical practice also included a statement explaining why its VEBA contributions did not conform to IRS regulations and the tax code. (Pl. Ex. 194 at 6-8; Def. Ex. 107 at 14-16.) The notice concluded that

> [i]n summary, it is found that the owner-employee of the company created an investment plan fully insured. The taxpayer intends to terminate this plan at some future date. The taxpayer created a VEBA as a flow through vehicle and deducted the investments as business expenses. What normally would have non-deductible dividends have now been deducted as an insurance expense.

(Pl. Ex. 194 at 8, Def. Ex. 107 at 14.)

On June 1, 1995, the IRS informed Plaintiffs Marvin and Karen Cetel that it was going to audit their personal income tax returns and the tax returns of Dr. Cetel's medical practice, Plaintiff Marvin Cetel, M.D., P.A. (Pl. SOF ¶ 269; Def. Ex. 106 at 38-39.) On August 7, 1995, the IRS issued the two examination reports, one for the Cetels' personal taxes and one for Dr. Cetel's practice. (Pl. Ex. 192 at 2; Def. Ex. 106 at 2, 11.) In those reports, the IRS listed in detail the amounts the IRS examiner determined the Cetels owed due to their VEBA contributions. For tax years 1992 and 1993, the reports stated that the Cetels' personal tax liability was $10,106.00. (Def. Ex. 106 at 2, 4-5.) The report also included $2021.20 in

4

negligence-related penalties and $1,813.06 in interest. (Id.) With regards to its audits of Dr. Cetel's medical practice, the IRS determined that it owed $11,612.00 in taxes, $2,322.40 in negligence-related penalties, and $2,238.59 in interest. (Pl. Ex. 192 at 2, 4-5; Def. Ex. 106 at 12, 14-15.) The examination report of Plaintiff Dr. Cetel's medical practice included the same explanation appended to Plaintiff Dr. Schneider's examination report which explained why the IRS was disallowing the VEBA deductions. (Pl. Ex. 192 at 6-8; Def. Ex. 106 at 16-18.) Thus, as of June 21, 1995, IRS considered the Cetels' VEBA-related tax liability to be $30,113.25.

On August 3, 1995, the IRS sent an examination report to Plaintiff Dr. Pearlman and his medical practice, Plaintiff Denville Radiology Associates. (Pl. Ex. 186; Def. Ex. 104.)  In that report, the IRS listed in detail the amounts the IRS examiner determined that Plaintiff Denville Radiology owed as taxes due to its disallowed VEBA contributions. For tax year 1993, the IRS disallowed $42,029.00 in VEBA contributions, and as a result, Denville owed $8,410.00 in taxes, $1,682.00 in penalties, and $1,332.45 in interest. (Pl. Ex. 186 at 2, 4-5; Def. Ex. 104 at 2, 4-5.) This report, like the reports for Dr. Cetel's and Dr. Schneider's medical practices, included the IRS's explanation as to why it was disallowing the deductions for the VEBA contributions. (Pl. Ex. 186 at 6-8; Def. Ex. 104 at 6-8.)

Plaintiff Sankla began participating in Defendants' VEBA in 1994, after he became a partner in Lakewood Radiology, a professional medical corporation. (Pl. SOF ¶ 307-08; Sankhla Ver. ¶ 7.) Plaintiff Sankhla contributed to Lakewood Radiology's VEBA plan. (See Pl. Ex. 11, 65:20-66:8.) In 1995, the IRS audited Lakewood Radiology's tax returns. (Sankhla Ver. ¶ 7.) As a result of these audits, the IRS disallowed $986,826.00 in VEBA contributions for fiscal year 1991 and calendar years 1992 and 1993. Neonatology II, 299 F.3d at 226. Plaintiff Sankhla was

not personally audited by the IRS. However, Plaintiff Sankhla states that he did learn that the IRS was auditing Lakewood Radiology's VEBA plan when his partners in that medical practice informed him "around mid-1995".[1] (Def. Ex. 49, Sankhla Dep. at 89:23 - 90:1.) Plaintiff Sankhla admits that when his partners told him of the IRS audits, "they were not able to fully explain the issues to [him] because they did not fully understand the issues themselves." (Sankhla Ver. ¶ 8.) Defendants contend that Plaintiff Sankhla became aware of the IRS's audit of Lakewood Radiology's VEBA plan in March 1995, when the IRS issued a summons for him to appear at an audit examination. (See Def. Monumental Supp. Cert., Ex. G.)

By April 1995, Plaintiff Dr. Shulman learned that the IRS had begun auditing the contributions of other doctors who had joined the VEBA plans at issue here. (Def. Ex. 108 ¶ 108.) In "mid-1995" the IRS informed Plaintiff Dr. Shulman that it would be auditing his personal tax returns and the tax returns of his practice, Plaintiff Yale Shulman, M.D., P.A., for 1993, 1994, and 1995, with respect to their participation in the VEBA. (Def. Ex. 17 ¶ 10.) However, this audit did not begin until 1996. (Pl. SOF ¶ 395.)

The IRS also issued a notice in 1995 that addressed whether contributions to employee welfare benefit funds, such as the VEBAs at issue here, were deductible. See I.R.S. Notice 95-34, 1995 WL 300780 (June 5, 1995). Notice 95-34 made clear that "[i]n general, these arrangements do not satisfy the requirements for exemption under [the tax code]." Id. at 1. The notice also emphasized "that the Service has never issued a letter ruling approving the deductibility of contributions to a welfare benefit fund. . .." Id. at 3. Most importantly, Notice 95-34 stated that "[t]axpayers and their representatives should be aware that the Service has

---

[1]The Court finds that "mid-1995" means the months of May, June, and July 1995.

6

disallowed deductions for contributions to these arrangements, and is asserting the positions discussed [in this notice] in litigation." Id.

In August 1995, Defendants Cohen and Kirwan sent a letter to Plaintiffs Dr. Cetel, Denville Radiology (Dr. Pearlman's medical practice), Dr. Shulman, and Dr. Schneider informing them that the IRS had issued Notice 95-34. (Pl. SOF ¶¶ 218, 271, 344, 383; Pl. Ex. 148, 181; Def. Ex. 40, 42, 44.) The subject line of the letter was "IRS Notice 95-34 on Welfare Benefit Plans." (Pl. Ex. 148, 181; Def. Ex. 40, 42, 44.) Attached to this letter was a letter from Neil Prupis ("Prupis"), dated July 12, 1995, a lawyer retained by Defendants Cohen and Kirwan. (Pl. Ex. 40.) In that letter Prupis summarized and discussed the IRS's conclusion that contributions to certain VEBA plans were not tax deductible. (Id. at 1.) Prupis characterized Notice 95-34 as "an attempt by the Internal Revenue Service to discourage the proliferation of multiple employee welfare benefit plans." (Id. at 2.) Prupis went on to assert that this determination had not been "upheld by any Court" and that while there was litigation addressing this very issue, a final determination "may take two to four years." (Id.) Prupis stated that Plaintiffs' VEBA plans "appear to be structured in the proper manner and in compliance with all existing legal authority." (Id.) (emphasis added). Prupis also cautioned that "if the deductions are ultimately disallowed, then [VEBA participants] will be subject to tax with respect to the contributions." (Id. at 3.)

On the advice of Defendant Cohen, Plaintiffs Schneider, Cetel, and Pearlman retained Prupis to represent them against the IRS. (Pl. SOF ¶¶ 225, 273, 347.) Lakewood Radiology, of which Plaintiff Sankhla was a partner, also retained Prupis, (see Pl. SOF ¶ 318), but the record does not reflect whether this was at Defendant Cohen's recommendation. Plaintiffs also allege

that Defendant Cohen urged them to continue to contribute to the VEBA plans, or risk losing any investment that they had made. (Pl. SOF ¶¶ 235, 277, 321, 354, 396.) Defendant Cohen and Prupis told Plaintiffs that the IRS was on a witch-hunt, and that Plaintiffs would ultimately prevail against the IRS in Tax Court. (Pl. SOF ¶¶ 234, 276, 318, 345, 398.) All of the Defendants relied on either the representations of Defendant Cohen or Prupis, or both, and continued to make contributions to their VEBA plans, (Pearlman Ver. ¶¶ 18, 24; Cetel Ver. ¶¶ 18-20, 25, 28; Sankhla Ver. ¶¶ 9-10; Shulman Ver. ¶¶ 13, 18, 24, 26-27; Schneider Ver. ¶¶, 17, 19, 23-24, 26, 29, 31), in spite of their knowledge that the IRS was questioning the deductibility of those contributions.

However, things did not turn out as Defendant Cohen and Prupis predicted. In Neonatology I, the Tax Court agreed with the IRS's assessment and found that the VEBAs at issue in this matter were frameworks that circumvented the intent and provisions of the Internal Revenue Code. 115 T.C. at 88-89. The Neonatology litigation initially involved 20 groups of physicians, including Plaintiffs, who, through their medical groups, had participated in Defendants' VEBA plans. Because all of the different parties shared the same basic facts as far as the jurisdiction of the Tax Court, two of these groups of physicians and their professional corporations were selected as a "test" case. Neonatology I, 115 T.C. at 44. Plaintiffs were not part of the "test" case, although Plaintiff Sankhla's employer group, Lakewood Radiology, was one of the "test" plaintiffs.

The Tax Court found that the plaintiffs' VEBA contributions were taxable disguised dividends and not deductible expenses. Id. at 91. The Third Circuit affirmed this decision. Neonatology II, 299 F.3d at 228. The courts found that these plans allowed the plaintiffs'

8

corporations to pay inflated life insurance premiums so that the excess contributions would be available for redistribution to the individual shareholders free of income taxes. <u>Neonatology II</u>, 299 F.3d at 228; <u>Neonatology I</u>, 115 T.C. at 88-89. The decision of the Tax Court was substantial for the <u>Neonatology</u> taxpayers and Plaintiffs because the professional medical corporations were denied deductions they had taken for their VEBA contributions and the individuals were charged with significant additional taxable dividend income. <u>See Neonatology II</u>, 299 F.3d at 223. The Third Circuit also upheld the Tax Court's finding that the individual taxpayers were liable for accuracy-related negligence penalties under I.R.C. § 6662(a). <u>Id.</u> at 233-35.

On July 20, 2000, Plaintiffs Schneider and Cetel filed a complaint against Prupis and his law firm, Defendant Kirwan, Defendant Cohen, Defendant Medical Society, CJA Defendants, and Monumental Defendants.[2] This Complaint (hereinafter referred to as the "Cetel Complaint") was removed to this Court on November 27, 2000. In the Cetel Complaint, Plaintiffs Schneider and Cetel allege that Defendants committed fraud (Counts I and II), fiduciary fraud/breach of fiduciary duty (Counts III and IV), breach of public policy (Count V), breach of contract (Count VI), breach of good faith and fair dealing (Count VII), negligence (Count VIII), and attorney malpractice (Count IX).

Plaintiff Sankhla filed his initial class action complaint on September 6, 2001. That Complaint was removed to this Court on October 12, 2001. On March 20, 2002, Plaintiff Sankhla filed an amended class action complaint (hereinafter referred to as the "Sankhla

---

[2]This Complaint originally included other defendants who are no longer parties to this litigation.

9

Complaint") adding Plaintiffs Shulman, Pearlman, Denville Radiology, the Cetels, and the

Schneiders as named plaintiffs. This Complaint named Prupis and his law firm, Defendants

Cohen, Kirwan, the Medical Society, the Murphy Defendants, Monumental Defendants, and the

CJA Defendants,[3] and contained the following claims: ERISA (Counts I and II), federal RICO

(Counts III through VI), conspiracy to violate federal RICO (Count VII), New Jersey's

Racketeering Act (Count VIII); conspiracy to violate New Jersey's Racketeering Act (Count IX);

New Jersey Consumer Fraud Act (Count X); unjust enrichment (Count XI); common law fraud

(Count XII); negligent misrepresentation (Count XIII); breach of fiduciary duty (Count XIV);

breach of contract (Count XV); breach of duty of good faith and fair dealing (Count XVI);

respondeat superior (Count XVII); and conspiracy and aiding and abetting (Count XVIII). The

class action allegations were voluntarily withdrawn by Plaintiffs. On November 25, 2002, the

Cetel and Sankhla actions were consolidated pursuant to Fed. R. Civ. P. 42(a). Prupis and his

firm settled with Plaintiffs and are no longer parties to this litigation.

On July 8, 2002, this Court entered an Order dismissing Plaintiffs' state law claims as

being preempted by ERISA. On March 2, 2004, the Court granted full summary judgment to

Defendants on Plaintiffs' federal RICO claims and partial summary judgment to Defendants on

Plaintiffs' ERISA claims. In its March 2, 2004 Opinion, this Court also reevaluated its July 8,

2002 decision to dismiss Plaintiffs' state law claims as preempted by ERISA. (3/2/04 Op. at 17.)

The Court found that Plaintiffs' state law claims did "not require an examination of the

particulars of the VEBA plans. Rather, these claims turn on Defendants' actions outside of the

---

[3]This Complaint originally included other defendants who are no longer parties to this
litigation.

ERISA context; reference to the VEBA plans will only form a backdrop to this action." (Id. at 19.) The Court then reinstated Plaintiffs' state law claims, and allowed Defendants the opportunity to file motions for summary judgment as to those claims. (Id.) It is these motions that are the subject of this Opinion.

The gravamen of Plaintiffs' Complaints is that Defendants induced Plaintiffs to participate in the VEBA plans by knowingly misrepresenting that the VEBA plans' tax benefits were legal and recognized by the IRS, various government agencies, and private entities. (Sankhla Compl't ¶¶ 13-16, 19, 24, 84, 135, 139-43, 151, 152; Cetel Compl't ¶¶ 1, 27, 32-35, Count I ¶¶ 7, 8, 9, 23, 32, Count II ¶¶ 7, 8, 23, 25, 36, Count V ¶¶ 1, 2, 5, 10, Count X ¶¶ 2, 3.) Specifically, Plaintiffs allege that

> [t]he Defendants knew that participants and/or prospective participants would not be likely to participate in the VEBA plan unless they believed that their contributions were fully tax-deductible and that they would be able to earn hundreds of thousands of dollars in tax-free retirement income through participation in the VEBA Plan. Therefore, these Defendants aggressively, and falsely, marketed the VEBA Plan by claiming that participants could make unlimited tax-deductible contributions to the VEBA Plan and that they would receive tax-free income out of the VEBA plan in the form of post-conversion "loans" from their individual insurance policies, with no adverse tax consequences to the principals of the company.

(Sankhla Compl't ¶ 139.) Plaintiffs also allege that Defendant Cohen told them that the IRS had approved their VEBA plans, and that this representation was crucial to their decisions to participate in the VEBAs. (Sankhla Compl't ¶¶ 84, 135e,152; Pl. SOF ¶¶ 211, 263, 308, 334, 336, 338, 364, 365; Sankhla Ver. ¶ 14; Schneider Ver. ¶ 10.) Plaintiffs contend that they relied heavily on the advice of Defendant Cohen because they did not understand the nuances of the VEBA. (Pl. SOF ¶¶ 210, 262, 308, 340, 366.)

## DISCUSSION

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1366 (3d Cir. 1996). Summary judgment is to be granted against the non-moving party when that party has failed to make a sufficient showing, after discovery, establishing an element of her claim that is essential to her case, and on which the non-moving party will bear the burden of proof at trial. Celotex, 477 U.S. at 322. In reviewing motions for summary judgment, the evidence is viewed in a light most favorable to the nonmovant. InterVest, Inc. v. Bloomberg, L.P., 340 F.3d 144, 159-60 (3d Cir. 2003).

Defendants have moved for summary judgment on most of the claims contained in the Sankhla and Cetel Complaints, arguing that these claims are barred as a matter of law and that Plaintiffs filed them outside of the statute of limitaions. As discussed below, this Court will grant Defendants' motions for summary judgment on Plaintiffs' claims for breach of contract (Sankhla Compl't, Count XV; Cetel Compl't, Count VI), and unjust enrichment (Sankhla Compl't, Count XI) because Plaintiffs have failed to establish a genuine issue of material fact with regard to those claims. Defendants will be granted summary judgment on Plaintiffs' claims under New Jersey's Consumer Fraud Act (Sankhla Compl't, Count X) because the Court finds, as a matter of law, that Act does not apply to the VEBA plans at issue here. Summary judgment will be granted to the Murphy Defendants on the allegations contained in Plaintiffs' remaining ERISA claim for breach of fiduciary duty, (Sankhla Compl't, Count I), because Plaintiffs have not alleged facts sufficient to support some of those allegations and failed to make the remaining

12

allegations within the statute of limitations. Lastly, the Court finds that the fraud-based counts contained in Plaintiff Sankhla's Complaint (Sankhla Compl't, Counts XII, XIV, XVI, XVIII) are barred by the statute of limitations.

## I. Breach of Contract

Count XV of the Sankhla Complaint and Count VI of the Cetel Complaint allege that certain Defendants breached their contractual duties to Plaintiffs. The Sankhla Complaint includes Defendant Cohen, Defendant Kirwan, CJA Defendants, and Murphy Defendants, while the Cetel Complaint alleges that only Defendant Cohen, Defendant Kirwan, and CJA Defendants breached their contractual obligations.[4] Plaintiffs allege that they entered into contracts with Defendants in which Defendants guaranteed to provide Plaintiffs with tax deductions for their VEBA contributions and tax free income. (Cetel Compl't, Count VI ¶ 2; Sankhla Compl't ¶ 379.) Defendants argue that summary judgment is appropriate because Plaintiffs have not pointed to any contract or contractual provision Defendants allegedly violated or which contains such guarantees. (Def. Murphy Br. at 27; Def. Monumental Br. at 3; Def. CJA Br. at 4.)[5]

This Court agrees with Defendants that Plaintiffs have failed to proffer sufficient evidence that Defendants breached any contractual obligation. In their briefs and statement of facts, Plaintiffs have not pointed to any contractual provision or duty that obligated Defendants to provide the tax benefits. Plaintiffs' only arguments in support of their breach of contract claim

---

[4] These Counts originally included the Monumental Defendants. However, in their opposition brief, Plaintiffs withdrew their breach of contract and breach of fiduciary duty claims against the Monumental Defendants. (See Pl. Monumental Br. at 2.)

[5] Defendant Cohen joined the arguments made by the other Defendants. (Def. Cohen Br. at 1.)

are contained in Plaintiffs' brief in opposition to the Murphy Defendants. (Pl. Murphy Br. at 35.)

The sole evidence to which Plaintiffs cite is a statement by Defendant Murphy at his deposition that he had an obligation to "annually review the VEBA plan to ensure that it complied with all legal requirements." (Pl. Murphy Br. at 35.) Yet, this evidence does not show that the Murphy Defendants breached a contractual duty that guaranteed Plaintiffs tax benefits, which is the basis for their breach of contract claims. (See Cetel Compl't, Count VI ¶ 2-4; Sankhla Compl't ¶ 379-80.) This evidence is not even applicable to the Cetel Complaint because the Murphy Defendants are not named therein. Because Plaintiffs have not established that Defendants violated any contractual provision or duty that guaranteed tax benefits, the Court will grant Defendants' motions for summary judgment on Plaintiffs' claims for breach of contract.

## II. Unjust Enrichment

Count XI of the Sankla Complaint alleges that all of the Defendants, except the Medical Society[6], were unjustly enriched at Plaintiffs' expense by their fraudulent misrepresentations as to the viability of the VEBA plans.[7] (Sankhla Compl't ¶¶ 366-68.) Unjust enrichment is a quasi-contractual remedy. Shalita v. Township of Washington, 636 A.2d 568, 571 (N.J. App. Div. 1994). To establish a claim for unjust enrichment a plaintiff must show that "it expected remuneration from a defendant at the time it performed or conferred a benefit on defendant and

---

[6] Plaintiffs voluntarily withdrew their unjust enrichment claims against Defendant Medical Society. (Pl. Medical Society Br. at 2.)

[7] While Defendant Cohen has joined in the arguments of the other Defendants as to this Count, (see Def. Cohen Br. at 1), the Court declines to determine whether summary judgment in favor of Defendant Cohen is appropriate as to Plaintiffs' unjust enrichment claim. Such a determination would require an examination of the issues specific to his case and neither party has addressed those issues.

that the failure of remuneration enriched defendant beyond its contractual rights." VRG Corp. v. GKN Realty Corp., 641 A.2d 519, 526 (N.J. 1994).

There must be a direct relationship between a plaintiff and a defendant or a mistake on the part of the party conferring a benefit for quasi-contractual liability to accrue. Callano v. Oakwood Park Homes Corp., 219 A.2d 332, 335 (N.J. App. Div. 1966). A party is precluded from recovering on a quasi-contractual basis if it has pleaded an express contractual obligation, absent a showing of rescission. Moser v. Milner Hotels, 78 A.2d 393, 394 (N.J. 1951) ("It is a well settled rule that an express contract excludes an implied one.") (citations and internal quotations omitted); see also Callano, 219 A.2d at 334 ("In the case of actual contracts the agreement defines the duty, while in the case of quasi-contracts the duty defines the contract.")

Relying on Moser, 78 A.2d at 394, the Murphy and Monumental Defendants contend that Plaintiffs' claim of unjust enrichment fails because Plaintiffs have pleaded express contractual relationships with them. (See Def. Monumental Br. at 13; Def. Murphy Br. at 23.) The CJA Defendants argue that summary judgment should be granted on Plaintiffs' unjust enrichment claim against it because Plaintiffs have failed to show any direct relationship with them or that Plaintiffs "expected remuneration" from them. (Def. CJA Reply Br. at 3.)

Plaintiffs' briefs are devoid of any arguments directed at the contentions of the Murphy Monumental Defendants. Plaintiffs' arguments are solely directed at the CJA Defendants. (See Pl. CJA Br. at 11-12; Pl. Monumental Br. at 1-2.) In its brief in opposition to the CJA Defendants' unjust enrichment arguments, Plaintiffs do not directly address CJA's contentions that there was no direct relationship or that Plaintiffs never expected remuneration from CJA. Instead, Plaintiffs argue that it would be improper to conclude, at the summary judgment phase,

that "CJA deserves to retain the outlandish commissions it improperly received from the plaintiffs." (Pl. CJA Br. at 12.)

A party must proffer evidence that there was a direct relationship between it and the alleged defendant and either that the plaintiff expected remuneration from the defendant or that the defendant was "enriched beyond its contractual rights" to establish a claim for unjust enrichment. See VRG Corp., 641 A.2d at 526; Callano, 219 A.2d at 335. With regard to the Murphy and Monumental Defendants, Plaintiffs point to no evidence that the Murphy and Monumental Defendants were enriched beyond the contractual rights that governed the parties' relationship. As to the CJA Defendants, Plaintiffs have not proffered any evidence that they had any direct relationship with CJA, that they expected remuneration from CJA during the time they participated in the VEBA, or that CJA was enriched beyond the contractual rights outlined in any agreement between Plaintiffs and CJA. As such, this Court finds that Plaintiffs have raised no genuine issue of material fact with regard to the CJA, Murphy, and Monumental Defendants' unjust enrichment arguments, and summary judgment will be granted in favor of those Defendants on this claim.

III. New Jersey's Consumer Fraud Act

Defendants have moved for summary judgment on Count X of the Sankhla Complaint, Plaintiffs' claims under New Jersey's Consumer Fraud Act ("Consumer Fraud Act"), N.J.S.A. 56:8-1 et seq. The Consumer Fraud Act provides, in pertinent part:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the

subsequent performance of such person as aforesaid, whether or not any person
has in fact been misled, deceived or damaged thereby, is declared to be an
unlawful practice.

N.J.S.A. 56:8-2. Under the Consumer Fraud Act, "merchandise" is defined as "any objects,

wares, goods, commodities, services or anything offered, directly or indirectly to the public for

sale." N.J.S.A. 56:8-1(c). A party that brings a successful claim under the Consumer Fraud Act

is entitled to treble damages, attorney's fees, and costs. N.J.S.A. 56:8-19.

Plaintiffs contend that the VEBA plans and insurance products supporting those plans are

"merchandise" within the meaning of the Consumer Fraud Act. Plaintiffs rely on Lemello v.

Beneficial Management Corp., 696 A.2d 546, 551 (N.J. 1997), in which the New Jersey Supreme

Court found that "our reading of the [Consumer Fraud Act] convinces us that the statute's

language is ample enough to encompass the sale of insurance policies as goods and services that

are marketed to consumers." They allege that Defendants violated N.J.S.A. 56:8-2 by

misrepresenting and concealing material facts as to whether the insurance-based VEBA plans

were legitimate tax avoidance mechanisms to induce Plaintiffs to participate. (Sankhla Compl't

¶ 360.)

The Consumer Fraud Act was enacted to proscribe "unlawful sales and advertising

practices designed to induce consumers to purchase merchandise or real estate." Daaleman v.

Elizabethtown Gas Co., 390 A.2d 566, 568 (N.J. 1978). The Act's use of the word "consumer"

is to be defined in accordance with the "ordinary meaning of that term in the marketplace." J&R

Ice Cream Corp v. California Smoothie Licensing Corp., 31 F.3d 1259, 1272-73 (3d Cir. 1994)

(citing Neveroski v. Blair, 358 A.2d 473, 480 (N.J. App. Div. 1976)).

While the New Jersey Supreme Court has concluded that the sale of insurance policies falls underneath the Consumer Fraud Act, Lemello, 696 A.2d at 551, the VEBA plans at issue here cannot be said to be ordinary insurance policies bought by ordinary consumers. The facts of Lemello revolved around the practice of "loan packing" whereby a commercial lender increased the principal of a consumer loan by including loan-related services that the debtor did not ask for or want. Id. at 548. The amount of the loan in that case was just $2,000.00. Id. at 549.

This matter presents a entirely different factual scenario. The facts of this case do not present a situation analogous to the purchase of everyday auto, home, or consumer credit insurance. Instead, the VEBA plans at issue here were extremely complicated tax avoidance schemes involving tens, if not hundreds, of thousands of dollars. Plaintiffs Sankhla, Cetel, Schneider, Pearlman, and Shulman, all highly educated doctors running or participating in medical practices, admit that they did not fully understand the VEBA plan when they began participating in it. (Pl. SOF ¶¶ 210, 340, 366; Cetel Ver. ¶ 9, Sankla Ver. ¶ 12.) Plaintiff Dr. Schneider admits that she still does not understand the VEBA plan. (Pl. SOF ¶ 224.) To apply the Consumer Fraud Act to the facts of this case would stretch the admittedly broad application of the Consumer Fraud Act beyond the intent of the New Jersey Legislature. As such, the Court finds that as a matter of law, the Consumer Fraud Act is not applicable to this situation and Defendants will be granted summary judgment for Plaintiffs' claims under New Jersey's Consumer Fraud Act.

IV. ERISA

The Murphy Defendants have moved for summary judgment on what remains of Count I of the Sankhla Complaint, breach of fiduciary duty under § 502(a)(3) of ERISA, 29 U.S.C. §

1132(a)(3).[8]  In this Court's March 2, 2004 Opinion and Order, it granted summary judgment in favor of Defendants on Count I as it related to § 409 and § 502(a)(2) of ERISA.  The Murphy Defendants contend that summary judgment should be granted on Plaintiffs' § 502(a)(3) claim because Plaintiffs have not provided any evidence that establishes that the Murphy Defendants committed the breaches outlined in Plaintiffs' Complaint, or in the alternative, that Plaintiffs failed to file their ERISA claim within the three-year statute of limitations outlined in 29 U.S.C. § 1113(2).[9]  (Def. Murphy Br. at 14-17.)

Plaintiffs allege that Murphy Defendants breached their fiduciary duty by making affirmative misrepresentations to Plaintiffs regarding the legality of the VEBA plans, concealing information, failing to establish trust accounts, receiving unreasonable compensation, and engaging in transactions adverse to the interests of the plan participants.  (Sankhla Compl't ¶ 287.)  Defendants contend that Plaintiffs have established no evidence that the Murphy Defendants breached their ERISA fiduciary duties in the manner alleged in the Complaint.  (Def. Murphy Br. at 16-17.)

The Court agrees with the Murphy Defendants that Plaintiffs have failed to proffer sufficient evidence that the Murphy Defendants failed to establish trust accounts, received unreasonable or excessive compensation, engaged in transactions adverse to the interests of the beneficiaries, mishandled plan assets, failed to disclose and concealed plan documents, and failed

---

[8] This Count originally included the Monumental Defendants, but Plaintiffs have voluntarily withdrawn their fiduciary claims against the Monumental Defendants.  (See Pl. Monumental Br. at 2.)

[9] While Defendant Cohen has joined in the arguments of the Murphy Defendants as to this Count, (see Def. Cohen Br. at 1), the Court declines to determine whether summary judgment in favor of Defendant Cohen is appropriate as to Plaintiffs' remaining ERISA claim.  Such a determination would require an examination of the issues specific to his case and neither party has addressed those issues.

to act in the interests of the Plaintiffs. (See Sankhla Compl't, Count I ¶ 287(c)-(h).) Thus, summary judgment will be granted to the Murphy Defendants on Count I as to those allegations.

However, there is a genuine issue of material fact as to whether the Murphy Defendants made or ratified material misrepresentations to Plaintiffs, or concealed material information from Plaintiffs. (See Sankhla Compl't, Count I ¶ 287(a), (b).) Thus, the Court must determine whether these specific allegations are barred by the three-year statute of limitations for fiduciary breach under ERISA.

Under ERISA, a plaintiff has three years from the date she has "actual knowledge" of the breach or violation of fiduciary duty to file her claim. 29 U.S.C. § 1113(2). A two-prong test is used to determine when a plaintiff possesses actual knowledge. See Gluck v. Unisys Corp., 960 F.2d 1168, 1177 (3d Cir. 1992). Actual knowledge of a breach or violation requires not only a showing that the plaintiff actually knew of the events that occurred which constituted the fiduciary breach, but also that he was aware that those facts supported a cause of action under ERISA. Richard B. Roush, Inc. Profit Sharing Plan v. New England Mut. Life Ins. Co., 311 F.3d 581, 585 (3d Cir. 2002). A plaintiff is aware of facts that support an ERISA action for fiduciary breach when she has "'actual knowledge' of harm inflicted or harmful consequences." Id. at 586. The Third Circuit mandates a stringent application of § 1113(2)'s actual knowledge requirement. Id. at 587.

The Court finds that Plaintiffs had actual knowledge of their remaining fiduciary breach allegations when they learned in 1995 that the IRS was going to disallow their VEBA contributions. The harmful consequences of the breach Plaintiffs allege were evident then: IRS audits and examination reports, Notice 95-34 and the attendant possibility that Plaintiffs would have to pay taxes, penalties and interest on money they allege the Murphy Defendants told them

would be tax-free. Because the statute of limitations began to run in 1995 and Plaintiff Sankhla did not file his complaint alleging an ERISA fiduciary breach until 2001, the Court will grant summary judgment to Murphy Defendants on the remaining allegations of Count I of the Sankhla Complaint.

## V. Statute of Limitations

Defendants have made a blanket argument that all of Plaintiffs' claims are barred by the statute of limitations. Because, as discussed above, the Court relies on other grounds to grant Defendants summary judgment on Plaintiffs' claims for breach of contract, unjust enrichment, New Jersey Consumer Fraud Act, and ERISA, the Court limits its statute of limitations discussion to Plaintiffs' fraud-based claims and their claim for negligent misrepresentation.

As discussed below, this Court finds that all of the remaining of counts of the Sankhla Complaint are time-barred. However, the Court also finds that because the claims asserted in the complaint of Plaintiffs Cetel and Schneider, filed on July 20, 2000, fall within the statute of limitations, Defendants' motions for summary judgment as to the remaining claims in that Complaint will be denied.

### A. Statute of Limitations under New Jersey's Racketeering Act, N.J.S.A. 2C:41-1 et seq.

None of the parties dispute that the Sankhla Complaint's non-racketeering claims, Counts X through XVIII, are governed by New Jersey's general six-year statute of limitations. See N.J.S.A. 2A:14-1. However, the parties do dispute the applicable statute of limitations as to Plaintiffs' Counts VIII and IX, alleged violations of the New Jersey Racketeering Act, N.J.S.A. N.J.S.A. 2C:41-2(c), (d). Defendants contend that New Jersey's Racketeering Act has a four-year statute of limitations. (Def. Murphy Br. at 5.) Plaintiffs counter that five years is appropriate. (Pl. Murphy Br. at 16.) The Court finds that a four-year statute of limitations is

21

applicable.

The Racketeering Act itself does not include a statute of limitations and the Appellate Division and New Jersey Supreme Court have not addressed the issue. See Smith v. Estate of Kelly, 778 A.2d 1162, 1166 (N.J. App. Div. 2001) (recognizing that one New Jersey court has applied a four-year statute of limitations to state civil RICO actions, but declining to decide whether that is correct); Fraser v. Bovino, 721 A.2d 20, 25 (N.J. App. Div. 1998) (declining to decide whether New Jersey's Racketeering Act has a four or five-year statute of limitations). However, in Liquidation of Integrity Insurance, 584 A.2d 286, 287 (N.J. Law Div. 1990), the court applied a four-year statute of limitations to civil actions under New Jersey's Racketeering Act. The court found that because New Jersey's racketeering statute was modeled on federal RICO, 18 U.S.C. § 1961 et seq., and federal courts were applying a four-year statute of limitations to federal civil RICO actions, New Jersey courts should apply a four-year statute of limitations to civil actions under New Jersey's Racketeering Act. Integrity Insurance, 584 A.2d at 287. The court buttressed its arguments on the fact that federal RICO "borrowed" its four-year statute of limitations from federal anti-trust laws, and New Jersey's Antitrust Act, N.J.S.A. 56:9-14, also has a four-year statute of limitations. Id.

Plaintiffs counter that in the absence of a statutory mandate, this Court should apply the N.J.S.A. 2C:1-6(g)'s general five-year statute of limitations for civil actions under New Jersey's Criminal Code. Plaintiffs cite to a number of New Jersey cases that limit the reliance on the federal RICO in interpreting the substantive aspects of New Jersey's Racketeering Act. See e.g., State v. Ball, 661 A.2d 251 (N.J. 1995). However, Plaintiffs do not cite to any case that applies a five-year statute of limitations to New Jersey's Racketeering Act. Integrity Insurance, on the other hand, has been cited with approval by at least two federal courts. See In re Bernheim

*Litigation*, 290 B.R. 249, 260 (D.N.J. 2003); *Companhia Sidergica Nacional v. D B Orban Co., Inc.*, 1991 WL 89645, at *6 (S.D.N.Y. May 23, 1991).

Moreover, while the New Jersey Supreme Court has limited its reliance on federal law in interpreting New Jersey's Racketeering Act, it has nonetheless reaffirmed that "because the federal statute served as an initial model for our own, we heed federal legislative history and case law in construing our statute." *Ball*, 661 A.2d at 258. In light of the fact that New Jersey's appellate courts have declined to address this issue, and the New Jersey Supreme Court has relied on federal law to aid in interpreting this statute, this Court will apply a four-year statute of limitations to New Jersey's Racketeering Act.

B. Accrual of Plaintiffs' Claims

In order to determine whether Plaintiffs' claims are barred by the statute of limitations, the Court must next determine when the claims accrued. Generally, a cause of action accrues, and a statute of limitations begins to run, at the time of the alleged injury. *See Caravaggio v. D'Agostini*, 765 A.2d 182, 187 (N.J. 2001). In certain circumstances, however, New Jersey courts apply the "discovery rule" which delays the accrual of a cause of action until a plaintiff knows, or after the exercise of reasonable diligence, should know, that he has suffered an injury that was caused by the fault of another. *Mancuso v. Neckles ex rel. Neckles*, 747 A.2d 255, 256 (N.J. 2000) (citations omitted); *Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group, Ltd.*, 181 F.3d 410, 425 (3d Cir. 1999) (citing *Baird v. American Med. Optics*, 713 A.2d 1019, 1026 (N.J. 1998)). The discovery rule only modifies the general rule of accrual "to the extent of postponing the commencement of accrual of the cause of action until plaintiff learns, or reasonably should learn, the existence of that state of facts which may equate in law with a cause of action." *Lapka v. Porter Hayden Co.*, 745 A.2d 525, 530-31 (N.J. 2000) (quoting *Burd v. New*

23

Jersey Tel. Co., 386 A.2d 1310, 1314 (N.J. 1978)). Once a plaintiff learns or should have learned

of facts that could lead to a potential cause of action, she has an "affirmative duty to use

reasonable diligence to investigate [that] potential cause of action." County of Morris v. Fauver,

707 A.2d 958, 972 (N.J. 1998).

When determining whether the discovery rule applies, a court must ask whether the

plaintiff filed her lawsuit within the statute of limitations beginning on the date she discovered,

or by the exercise of reasonable diligence and intelligence should have discovered, the basis for

her actionable claim. Lapka, 745 A.2d at 529. This standard boils down to "whether plaintiff

'knew or should have known' of sufficient facts to start the statute of limitations running."

Caravaggio, 765 A.2d at 187 (citing Baird, 713 A.2d at 1028). This requires a court to determine

two things: when a plaintiff became or reasonably should have become aware she was injured

and when she became aware, or reasonably should have become aware that the injury was due to

the fault of another. Id. (citing Savage v. Old Bridge-Sayreville Med. Group, 633 A.2d 514, 518

(N.J. 1993)).

C. Plaintiffs' Fraud-Based Claims

The Sankhla Complaint's Count VIII (New Jersey Racketeering), Count IX (New Jersey

Racketeering conspiracy), Count XII (fraud), Count XIV (breach of fiduciary duty), Count XVI

(breach of good faith and fair dealing), Count XVII (respondeat superior), and Count XVIII

(conspiracy and aiding and abetting) are predicated on Plaintiffs' allegations that Defendants

engaged in fraudulent conduct by intentionally misrepresenting that the IRS had approved the

VEBA plans, and knowingly concealing and failing to disclose material information. (Sankhla

Compl't ¶¶ 13-16, 19, 24, 84, 135, 139-43, 151, 152, 351, 352, 356, 366, 367, 376, 383, 386,

390, 391.) To state an action for fraud in New Jersey, a plaintiff must establish five elements: (1)

a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." Kaufman v. i-Stat Corp., 754 A.2d 1188, 1195 (N.J. 2000). Under New Jersey law, a claim for fraud accrues "on discovery of the wrong or of facts that reasonably should lead the plaintiff to inquire into the fraud." Southern Cross, 181 F.3d at 425.

It is clear that Plaintiffs were all aware of facts by the summer of 1995 that would have led a reasonable person to have an awareness that she may have been the victim of fraud. Plaintiffs allege that they began participating in Defendants' VEBA plans because Defendant Cohen represented that the IRS had approved the plans. (Pl. SOF ¶¶ 108-113, 211, 263, 308, 334, 336, 338, 364, 365; Cetel Ver. ¶ 11; Pearlman Ver. ¶ 10; Shulman Ver. ¶ 11; Schneider Ver. ¶ 10; Sankhla Ver. ¶ 14.) All of the Plaintiffs state that at the time they began participating in the VEBA plans, Defendant Cohen's representation that the VEBA plans had "IRS approval" meant

> that the IRS had studied the entire VEBA plan and had concluded that the representations being made [to them by Cohen], such as tax deductibility of contributions and the ability to withdraw retirement funds tax-free after conversion, were appropriate under the tax laws.

(Cetel Ver. ¶ 11; Pearlman Ver. ¶ 10; Shulman Ver. ¶ 11; Schneider Ver. ¶ 10; Sankhla Ver. ¶ 14.)

By August 1995, all of the Plaintiffs had either learned of IRS Notice 95-34 or had learned that the IRS had audited or was going to audit their personal or medical practices' tax returns as a result of their VEBA contributions. (See Pl. SOF ¶¶ 188, 213, 214, 218, 269, 271, 272, 317, 344, 345, 383; Def. Ex. 49, Sankhla Dep. at 89:23 - 90:1.) The Court concludes that if, as Plaintiffs allege, they relied upon Defendant Cohen's representation that the IRS had approved the VEBA plans at issue here, then any IRS action challenging the legality of their VEBA

contributions would have alerted a reasonable person that Defendant Cohen may have lied to her about the IRS approval.

Yet, in spite of these clear signs that Defendant Cohen may have misrepresented the IRS's approval of the VEBA plans, Plaintiffs did not engage in reasonable inquiries into this alleged fraud. Instead, they all went to Defendant Cohen, the person who may have lied to them in the first place, to ask whether their money was safe and to ask him what to do.[10] (Pl. Murphy Br. at 25.) Plaintiffs make much of the fact that Defendant Cohen referred them to Prupis, a lawyer with a supposed expertise in tax matters, and that they relied on Prupis' representations that the IRS's interpretation of the tax was wrong. (Id.) Some of the Plaintiffs also went to their accountant, Alan Steinberg, who they admit "did not know anything about the VEBAs" and who just consulted with Prupis. (Id.)

The Court disagrees with Plaintiffs' assertion that in spite of the IRS examination reports, audits, and Notice 95-34, that Plaintiffs had no "reason to disbelieve their trusted advisors."[11] (Pl. Murphy Br. at 23.) Asking Defendant Cohen, who clearly had a substantial financial interest in the VEBA, whether the plans were legal does not constitute reasonable diligence. Retaining a lawyer recommended to you by the person who clearly may have lied to you is not reasonable diligence. Nor is going to an accountant who admits that he has no understanding of the plan and just relies on the representations of that lawyer. In addition, the Court finds that even if Plaintiffs

---

[10] The Court notes that in the Third Circuit's Neonatology II decision the court questioned whether it would be reasonable for any person to rely on the "advice of a professional promoting a tax shelter for a fee." 299 F.3d at 234 n.22.

[11] While this Court does not address the issue of whether Defendant Cohen's representations as to the VEBA plans were believable when first made, it notes that "[w]hen a taxpayer is presented with what would appear to be a fabulous opportunity to avoid tax obligations, he should recognize that he proceeds at his own peril." Neonatology II, 299 F.3d at 234.

believed Prupis' and Cohen's guarantee of a victory in the Tax Court, this does not negate the fact that Plaintiffs should have been aware that Defendant Cohen may have practiced fraud upon them when he initially represented that the IRS had approved the plans. This is especially true considering how Plaintiffs defined "IRS Approval." (See Cetel Ver. ¶ 11; Pearlman Ver. ¶ 10; Shulman Ver. ¶ 11; Schneider Ver. ¶ 10; Sankhla Ver. ¶ 14.)

Plaintiffs next contend that the statute of limitations does not run on their fraud actions until they suffered actual damages. They reason that because IRS Notice 95-34 and the 1995 audits and examination reports did not impose any liability on Plaintiffs, they had no injury until the IRS issued deficiency notices requiring them to remit payment. (Pl. Murphy Br. at 24.)

Plaintiffs are incorrect that a claim based on fraud requires actual damages. Under New Jersey law, a fraud claim is actionable regardless of whether a plaintiff can show actual damages. Nappe v. Anschelewitz, Barr, Ansell & Bonello, 477 A.2d 1224, 1232-33 (N.J. 1984); see also Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1168 n.7 (3d Cir. 1993). Because the intent of actions for fraud is to combat unfair dealing, as long as a plaintiff can establish that she relied on a defendant's intentional misrepresentation of a material fact, she is "entitled to vindicate [her] rights through an award of nominal damages and in appropriate cases to punish the defendant through an award of punitive damages." Nappe, 477 A.2d at 1232. Thus, the injury in a fraud action is not the resulting money damages, but is instead the fraud itself.

Plaintiffs also contend that while it might have been obvious that Defendant Cohen misrepresented material facts, and thus was "at fault," they had no way of knowing until later the roles the other Defendants played in the alleged fraudulent enterprise.[12] (Pl. Murphy Br. at 26.)

---

[12] However, Plaintiffs do admit that they knew the insurance company Defendants and the Medical Society were involved in the VEBA plans. (Schneider Ver. ¶ 8, 9; Shulman Ver. ¶ 9, 10; Sankhla Ver. ¶ 6, 13; Pearlman Ver. ¶¶ 8,9; Cetel Ver. ¶¶ 6,10.)

Thus, Plaintiffs contend, the second prong of the discovery rule, "knowledge of fault" was not present in 1995. However, while knowledge of fault is required before a claim can accrue under the discovery rule, this factor requires awareness of facts

> that it is possible--not provable or even probable--that a third person's conduct that caused the injury was itself unreasonable or lacking in due care. Thus, knowledge of fault for purposes of the discovery rule has a circumscribed meaning: it requires only the awareness of facts that would alert a reasonable person exercising ordinary diligence that a third party's conduct may have caused or contributed to the cause of the injury and that conduct itself might possibly have been unreasonable or lacking in due care.

Savage v. Old Bridge-Sayreville Med. Group, 633 A.2d 514, 518 (N.J. 1993). Moreover, once a party knows, or reasonably should know that she has been injured, "it behooves [a party] to consult counsel promptly. It then becomes incumbent on counsel to investigate the matter, retain experts if required, and institute suit when the facts suggest a claim is well-founded. If counsel is uncertain about the identity of the culpable party, he or she may resort to the fictitious-name procedure in Rule 4:26-4." Viviano v. CBS, Inc., 503 A.2d 296, 301 (N.J. 1986). Because Plaintiffs did not reasonably investigate their potential claims, they are precluded from arguing that they lacked knowledge of fault. See County of Morris, 707 A.2d at 972 ("[T]he discovery rule imposes on plaintiffs an affirmative duty to use reasonable diligence to investigate a potential cause of action, and thus bars from recovery plaintiffs who had 'reason to know' of their injuries.").

Because Plaintiffs were aware of sufficient facts by August 1995 that would lead a reasonable person to diligently investigate their potential fraud-based claims, accrual will be set at August 1995. Plaintiffs Schneider and Cetel learned in June 1995 that the IRS was going to audit their VEBA contributions and received the Notice 95-34 letter from Defendant Cohen in August 1995. (Pl. SOF ¶¶ 213, 218, 269, 271; Pl. Ex. 193, 194; Def. Ex. 106 at 38-39, 107). In

August 1995, Plaintiff Pearlman received an IRS examination report and Defendant Cohen's Notice 95-34 letter. (Pl. SOF ¶ 344; Pl. Ex. 186; Def. Ex. 104.) Plaintiff Shulman learned in April 1995 that the IRS was auditing other physicians' contributions to the VEBA plan in which he was participating, (Def. Ex. 108 ¶ 108), and the IRS informed him in "mid-1995" that it was going to audit his VEBA contributions, (Def. Ex. 17 ¶ 10). In August 1995, he received Defendant Cohen's Notice 95-34 letter. (Pl. SOF ¶ 383.) In "mid-1995" Plaintiff Sankhla learned that the IRS was auditing the VEBA plan to which he contributed as a partner at Lakewood Radiology. (Def. Ex. 49, Sankhla Dep. at 89:23-90:1.) There is also evidence that Plaintiff Sankhla may have learned of the IRS's audit of Lakewood Radiology in March 1995. (See Def. Monumental Supp. Cert., Ex. G.)

Because Plaintiffs' claims under the New Jersey Racketeering Act, (Sankhla Compl't, Counts VIII and IX), have a four-year statute of limitations the latest any of the Plaintiffs could have filed these claims was in 1999. Because the Sankhla Complaint was not filed until September 2001, these claims are barred.

The Sankhla Complaint's claims for fraud (Count XII), breach of fiduciary duty (Count XIV), breach of good faith and fair dealing (Count XVI), respondeat superior (Count XVII), conspiracy and aiding and abetting (Count XVIII) have a six-year statute of limitations. N.J.S.A. 2A:14-1. Because Plaintiffs did not file these claims until September, 2001, over six years after all of the Plaintiffs became aware of sufficient facts in support of their fraud-based claims, these claims are also barred by the statute of limitations.

D. Negligent Misrepresentation

Count XIII of the Sankhla Complaint alleges that Defendants negligently misrepresented that, among other things, the IRS had approved the VEBA plans. (Sankhla Compl't ¶ 371-72.)

Applying the same accrual analysis as above, there is no question that Plaintiffs were aware at various points in the late spring and summer of 1995 of facts sufficient to lead a reasonable person to believe that Defendants had misrepresented material facts to induce them to participate in the VEBA. Because this claim has a six-year statute of limitations and Plaintiffs did not file this claim until September 2001, over six years after all of the Plaintiffs became aware of facts sufficient to support this claim, this claim is time-barred.

VI. Plaintiffs' Motion for Reconsideration

Plaintiffs have moved this Court to reconsider its March 2, 2004 Opinion and Order granting Defendants summary judgment on Plaintiffs' federal RICO claims and almost all of Plaintiffs' ERISA claims. Because the Court finds that Plaintiffs' motion does not allege manifest errors of law or fact, or present newly discovered evidence, Max's Seafood Café v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999), this motion will be denied.

CONCLUSION

For the above reasons, the Court will grant the Medical Society, Murphy, Monumental, and CJA Defendants' motions for summary judgment; Defendant Cohen's motion for summary judgment will be granted in part; and Plaintiffs' motion for reconsideration will be denied. The accompanying Order will be entered.


July 16, 2004                                           s/ Anne E. Thompson
DATE                                            ANNE E. THOMPSON, U.S.D.J.


30

# EXHIBIT C

REED SMITH LLP
*formed in the State of Delaware*
Diane A. Bettino, Esquire (DAB-0678)
Princeton Forrestal Village
136 Main Street, Suite 250
Princeton, N.J. 08543

HINES SMITH, LLP
Kevin Smith, Esquire (KS-7440)
3080 Bristol Street, Suite 540
Costa Mesa, CA 92626

RECEIVED

DEC 2 3 2004

AT 8:30 _____ M
WILLIAM T. WALSH
CLERK

Attorneys for Defendants, Commonwealth Life Insurance Company, Peoples Security Life
Insurance Company, Capital Holding Company, AEGON USA, Inc. and Monumental Life
Insurance Company

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| KAREN CETEL, et al.,<br><br>    **Plaintiffs,**<br><br>v.<br><br>KIRWAN FINANCIAL GROUP, INC., et al.,<br><br>    **Defendants.** | CIVIL ACTION NO. 00-5799 (AET) |

## CONSENT JUDGMENT

**THIS MATTER** having been opened to the Court by Archer & Greiner, P.C., attorneys

for Barbara Schneider, Morton Schneider, Barbara Schneider, M.D., F.A.C.S. (the "Schneider

Plaintiffs") and Marvin Cetel, Karen Cetel and Marvin Cetel, M.D., P.A. (the "Cetel Plaintiffs")

and Reed Smith LLP and Hines Smith LLP, attorneys for Defendants Commonwealth Life

Insurance Company, Peoples Security Life Insurance Company, Capital Holding Company,

AEGON USA, Inc. and Monumental Life Insurance Company; pursuant to and subject to the

terms of a Confidential Limited Release and Settlement between these parties which provides for the entry of a Judgment by Consent against Monumental Life Insurance Company;

IT IS on this ___ day of September, 2004, CONSENTED to by these parties, through their undersigned counsel and ORDERED by the Court that JUDGMENT is hereby entered as follows with respect to the claims of the plaintiffs that remain for trial as a result of the Court's Order of July 16, 2004, granting partial summary judgment and dismissing certain of plaintiffs' claims:

1. In favor of the Cetel Plaintiffs and against Monumental Life Insurance Company only in the amount of $71,132.93;

2. In favor of the Schneider Plaintiffs and against Monumental Life Insurance Company only in the amount of $71,132.93;

3. In favor of Monumental Life Insurance Company, Commonwealth Life Insurance Company, Peoples Security Life Insurance Company, Capital Holding Company and AEGON USA, Inc. and against Plaintiffs DISMISSING all remaining claims of Plaintiffs against these entities; and

4. These parties will bear their respective costs.

**THE FOREGOING IS HEREBY CONSENTED TO by the undersigned counsel and ORDERED by the Court.**

**IT IS SO STIPULATED AND AGREED:**

**ARCHER & GREINER**
Attorneys for Plaintiffs

_____     Dated: 9/8/04

**REED SMITH LLP**
Attorneys for Monumental Life Ins. Co., Peoples Security Life Ins. Co., Commonwealth Life Ins.
Co., Capital Holding Company and AEGON USA, Inc.

Dated: 9/8/04

IT IS SO ORDERED:

Hon. Anne E. Thompson, U.S.D.J.          12-21-04

3